Charles F. Robinson (SBN 113197)
Kelly L. Drumm (SBN 172767)
kelly.drumm@ucop.edu
UNIVERSITY OF CALIFORNIA
Office of General Counsel
1111 Franklin St., 8th Flr.
Oakland, California  94607
Telephone:  (510) 987-9765
Facsimile:  (510) 987-9757

Amrit S. Kulkarni (SBN: 202786)
akulkarni@meyersnave.com
Shiraz D. Tangri (SBN: 203037)
stangri@meyersnave.com
Adam J. Regele (SBN: 295235)
aregele@meyersnave.com
MEYERS, NAVE, RIBACK, SILVER & WILSON
707 Wilshire Boulevard, 24th Floor
Los Angeles, California 90017
Telephone: (213) 626-2906
Facsimile: (213) 626-0215

Attorneys for Plaintiff
THE REGENTS OF THE
UNIVERSITY OF CALIFORNIA

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, a California public corporation,<br><br>Plaintiff,<br><br>v.<br><br>FEDERAL EMERGENCY MANAGEMENT AGENCY, a federal government entity; ROBERT J. FENTON, JR., in his official capacity; JEFFREY D. LUSK, in his official capacity; CALIFORNIA OFFICE OF EMERGENCY SERVICES, a California public agency; and MARK S. GHILARDUCCI, in his official capacity;<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.     This complaint is brought pursuant to the Stafford Act, 42 U.S.C. §§ 5133 *et seq.*, the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, to void the decision by the Federal Emergency Management Agency ("FEMA") in September 2016 to terminate previously awarded Pre-Disaster Mitigation ("PDM") grant funding for hazardous fire risk reduction in the East Bay Hills, California.  FEMA's decision is in direct contravention to the agency's prior conclusions in February 2015 that the grants were necessary to reduce wildfire risks to public health and welfare, and to avoid potentially significant environmental impacts.  Despite making those findings based on years of research and inter-agency cooperation, FEMA abruptly disregarded those conclusions and decided unilaterally to terminate this funding to resolve litigation filed by a third-party.  FEMA's decision was illegal and improper because FEMA acted without the consent of The Regents of the University of California ("University"), as mandated by federal regulations, and without conducting supplemental environmental review, as required by NEPA.

2.     The funding terminated by FEMA was awarded in March 2015 to fund the University's portion of a region-wide project ("Project") to substantially reduce wildfire risks to human life and structures.  In the past century, fifteen major wildfires have afflicted the East Bay Hills, burning over 9,000 acres, destroying approximately 4,000 homes, and killing 26 people.

3.     FEMA's illegal termination also resulted in delaying – perhaps indefinitely – Project-related work the University planned to perform starting in September 2016.  FEMA's action could subject the East Bay Hills to years of increased fire hazard risks and associated environmental impacts.  FEMA's decision is especially egregious given the agency's finding that failure to move forward with the wildfire mitigation work could result in potential destruction of vegetation, wildlife and wildlife habitat; soil erosion and increased risk of landslides; increased sedimentation of streams and water bodies; greater air pollution and greenhouse gas production; potential destruction of historic resources; devastating impacts to residential communities and businesses; greater risk to health and human safety; disruption of public safety and other services; and the potential destruction of recreational facilities and infrastructure.

4.      FEMA awarded four grants, including two to the University, to fund the fire mitigation Project.  FEMA awarded the grants after more than a decade of working with the University and other federal, state and local agencies to confirm the effectiveness of the proposed vegetation management activities in reducing long-term hazardous fire risk.

5.      In addition, FEMA spent years analyzing the potential environmental impacts of the proposed work pursuant to NEPA, culminating in a Final Environmental Impact Statement ("FEIS") in November 2014.  The FEIS concludes that the Project was environmentally superior to other alternatives considered, and that greater environmental impacts would result from not moving forward with the vegetation removal work.  In addition, the FEIS states that a supplement to the FEIS to assess the environmental impacts of a reduced project must be prepared "should FEMA decide not to fund all four applications."  (*See* FEIS § 3.4.2 at 3-10.)

6.      FEMA ultimately approved all four grants analyzed in the FEIS, pursuant to a February 26, 2015 Record of Decision ("ROD") concluding that the "reduction of hazardous fire risk would reduce the need for future disaster relief and the risk of repetitive suffering and damage."  (ROD at 1.)  The ROD expressly stated that if FEMA did not fund the four grant applications for wildlife management in the East Bay Hills, the local agencies' individual vegetation management activities "would not result in effective hazardous fire risk reduction along the wildland-urban interface of the East Bay Hills."  (*Id.* at 3.)

7.      In blatant disregard for its well-supported prior conclusions, NEPA's requirements, and applicable federal regulations, FEMA unilaterally decided in September 2016 to terminate three of the four grants for the fire risk reduction Project – including both grants to the University, over the University's express objections and without any right of appeal.

8.      In reversing course after over a decade of agency cooperation, FEMA ignored every procedural and substantive requirement to effectively terminate the grant funding.

9.      In light of FEMA's decision to disregard the environmental analyses and findings in the FEIS and ROD, and terminate the PDM grants without the necessary consent of the University, the University brings this action seeking declaratory and injunctive relief.

/ / /

2
COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

**JURISDICTION AND INTRADISTRICT ASSIGNMENT**

10.     Jurisdiction over this action is conferred by 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346 (United States as defendant), 28 U.S.C. § 2201 (declaratory relief), and 28 U.S.C. § 2202 (injunctive relief) and the Administrative Procedures Act, 5 U.S.C. §§ 701-706.   This Court has jurisdiction under 28 U.S.C. § 1331 because this action involves an agency of the United States as a defendant, and arises under the laws of the United States, including NEPA, 42 U.S.C. 4331 *et. seq.*, the Administrative Procedure Act, 5 U.S.C. § 700 *et seq.*, and the Stafford Act, 42 U.S.C. § 5133.  FEMA's issuance and amendment of the ROD approving the FEIS and the Project constitutes a final agency action.  There exists an actual controversy between the parties within the meaning of 28 U.S.C. § 2201 (declaratory judgments).

11.     This Complaint is timely filed within the applicable statute of limitations.

12.     Venue is properly vested in this Court pursuant to 28 U.S.C. § 1391(e).  Pursuant to Local Rule 3-2(c), intradistrict assignment is proper in San Francisco or Oakland divisions because the property that is the subject of this action is situated in Contra Costa and Alameda Counties, California; further, the events or omissions giving rise to the action occurred therein.

**PARTIES**

13.     Plaintiff THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, is a California public corporation, authorized and empowered to administer a public trust known as the University of California, pursuant to Article IX, Section 9, subdivisions (a) and (f) of the California Constitution.

14.     Defendant the FEDERAL EMERGENCY MANAGEMENT AGENCY is a federal agency, organized as a separate agency within the United States Department of Homeland Security.  FEMA awarded the grant funding for the Project pursuant to its PDM program and/or the Hazard Mitigation Grant Program ("HMGP").  FEMA served as the lead agency for the Project and preparation of the FEIS pursuant to NEPA.

15.     Defendant ROBERT J. FENTON, JR. is the Acting Administrator of FEMA, and was the official who signed the Amended ROD on September 20, 2016 as Regional Administrator for Region IX of FEMA.  Acting Administrator Fenton is sued in his official capacity.

16.     Defendant JEFFREY D. LUSK is the director of the Mitigation Division of FEMA, Region IX, and was the official who signed the letter informing the California Governor's Office of Emergency Services that FEMA was terminating a portion of the grant funding for the Project. Director Lusk is sued in his official capacity.

17.     Defendant the CALIFORNIA GOVERNOR'S OFFICE OF EMERGENCY SERVICES ("Cal OES") is a division of a California executive agency, and formerly known as the California Office of Emergency Management.  Cal OES is the formal applicant to FEMA for funding for the Project.  Cal OES will oversee disbursement of awarded funds to each of the sub-recipients, including the University.

18.     Defendant MARK S. GHILARDUCCI is the Director of Cal OES.   Director Ghilarducci is sued in his official capacity.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.     Hazardous Wildfire Risk In The East Bay Hills

19.     The need for vegetation management in the East Bay Hills arises from the repetitive nature of catastrophic wildfires in the Project area and the proximity of residential areas to non-native trees, underbrush, and other natural debris that are susceptible to fires.  (ROD at 10.)

20.     Between 1923 and 1992, fifteen major wildfires occurred in the East Bay Hills of Alameda and Contra Costa Counties, California.   These wildfires burned approximately 9,000 acres, destroying approximately 4,000 homes, and killing 26 people.  (FEIS § 2.1 at 2-2.)

21.     The Project was developed through more than a decade of inter-agency research and cooperation in response to the catastrophic 1991 Tunnel Fire – the worst fire in the history of California, which killed 25 people, destroyed more than 3,000 homes and caused more than $1.5 billion in property damage.

22.     Most of the undeveloped areas in the East Bay Hills are identified as very high fire hazard severity zones by the California Department of Forestry and Fire Protection.  (*Id.*)  Factors contributing to the high fire risk in the area include hot and dry fall seasons, wind-conducive topography, flammable vegetation, dense development, lack of pumping facilities and water for

fighting fires in residential areas, and limited accessibility for firefighting.  (*Id.*)  The East Bay Hills are subject to hot, dry winds from the northeast that can drive a wildfire from the regional parks and other open space areas into residential areas.  (*Id.*)

23.     Fire suppression efforts in an ecosystem where fire historically played an integral part in shaping vegetation structure and biological diversity have also resulted in changes to the vegetation types.  (FEIS § 4.3 [Fires and Fuels] at 4.3-8.)  Vegetation that burned with a lower intensity fire has been replaced with invasive non-native vegetation that is more fire-prone and that burns with greater intensity and greater severity.  (*Id.*)

24.     The East Bay Hills now contain many areas with dense flammable vegetation – primarily fire-prone non-native eucalyptus and pine trees.  (FEIS § 2.1 [Purpose and Need] at 2-1.)

25.     The East Bay Hills contain hundreds of acres of this highly flammable, dense non-native vegetation, including eucalyptus groves that "tend to accumulate dead, dry material around them," and extensive ladder fuels that "contribute[ ] to high-intensity fires."  (FEIS § 2.1 [Purpose and Need] at 2-1, 2-2.)

26.     Without the Project, the East Bay Hills and its surrounding communities continue to be vulnerable to catastrophic wildfire.  (Executive Summary of FEIS at ES-7.)

**B.     Project Funding Applications**

27.     FEMA's statutory mission includes addressing fire risk hazard, as authorized by the Robert T. Stafford Disaster Relief and Emergency Assistance Act of 1988 ("Stafford Act"), 42 U.S.C. § 5121 *et seq.*

28.     Section 203 of the Stafford Act establishes the Pre-Disaster Mitigation ("PDM") grant program.  (42 U.S.C. § 5133.)  The PDM is designed to assist States, territories, federally-recognized tribes, and local communities to implement a sustained pre-disaster natural hazard mitigation program to reduce overall risk to the population and structures from future hazard events, while also reducing reliance on Federal funding in future disasters.  (*See* Hazard Mitigation Assistance Guidance (February 27, 2015), *available at* https://www.fema.gov/media-library/assets/documents/103279.)

/ / /

29.     The HMGP is authorized by Section 404 of the Stafford Act.  (42 U.S.C. § 5170c.)  The key purpose of HMGP is to ensure that the opportunity to take critical mitigation measures to reduce the risk of loss of life and property from future disasters is not lost during the reconstruction process following a disaster.  (*Id.*)

30.     Based on the wildfire hazard characteristics of the East Bay Hills and the Miller/Knox Regional Shoreline, FEMA concluded that a need exists to reduce hazardous fire risk to people and structures in these areas.  (Executive Summary of FEIS at ES-7.)

31.     FEMA proposed to address this need by providing financial assistance to the University, the City of Oakland, and the East Bay Regional Park District ("Park District") through the PDM and HMGP programs for long-term, cost-effective fuel reduction measures to reduce risk of loss of life and damage to vulnerable structures from wildfire.  (*Id.*)

32.     The University, the City of Oakland, and the EBRPD applied to FEMA, through the Cal OES, formerly named the California Emergency Management Agency, for financial assistance under FEMA's PDM program and the HMGP.  (FEIS § 2.1 [Purpose and Need] at 2-3.)

33.     On or about August 4, 2005, the University applied for FEMA grant funding for fire mitigation work proposed for 43 acres in Claremont Canyon, located on the campus of the University of California, Berkeley ("UCB"), in a grant application referenced as PDMC-PJ-09-CA-2005-003.

34.     In addition, the University requested FEMA grant funding for fire mitigation work proposed for 56 acres in UCB's Strawberry Canyon area, in a grant application referenced as PDMC-PJ-09-CA-2005-011, submitted on or about August 4, 2005.

35.     The University also submitted an application for FEMA grant funding for similar vegetation management activities on a 185.2-acre area of the UCB campus known as Frowning Ridge.  FEMA ultimately determined not to fund the Frowning Ridge grant application.

36.     The City of Oakland submitted a grant application for PDM funding in 2006 for 359.0 acres, referenced as PDMC-PJ-09-CA-2006-004.

37.     The Park District sought HMGP funding for work on 540.2 acres in 11 regional parks.

38.     In addition, the Park District proposed similar vegetation management projects on additional 1,061 acres ("Connected Actions"), for which it did not seek FEMA funding.

39.     The four grant applications (PDMC-PJ-09-CA-2005-003, PDMC-PJ-09-CA-2005-0011, PDMC-PJ-09-CA-2006-004, and HMGP DR-1731-16-34) that make up the Project consist of vegetation management work covering approximately 998.3 acres in the East Bay Hills and the Miller/Knox Regional Shoreline area.  (FEIS § 1 [Introduction] at 1-2.)

40.     The Project and the Connected Actions are intended to create a continuous firebreak across over 2,000 acres of very high fire hazard severity zones within lands owned by the Park District, the University, and the City of Oakland in the East Bay Hills within Alameda and Contra Costa Counties, California.  (FEIS § 3.4.2 [Alternatives Including the Proposed and Connected Actions] at 3-9.)

41.     The U.S. Forest Service ("USFS"), the National Park Service ("NPS"), the U.S. Fish and Wildlife Service ("USFWS"), the National Marine Fisheries Service ("NMFS" or "NOAA"), Cal OES, the University, the City of Oakland, and EBRPD are cooperating agencies that assisted FEMA throughout the grant review process.  (FEIS § 1 [Introduction] at 1-5.)

42.     FEMA and the cooperating agencies executed a memorandum of understanding to govern their working relationship for preparation of this FEIS.  (FEIS § 1.3 [Introduction] at 1-5.)

43.     The funding was to be used to implement the Project activities in order to substantially reduce hazardous fire risk to people and structures in the East Bay Hills and the vicinity of Miller/Knox Regional Shoreline.  (FEIS § 2.1 [Purpose and Need] at 2-1.)   FEMA concluded that the reduction of hazardous fire risk would reduce the need for future disaster relief and the risk of repetitive suffering and damage.  (*Id.*)

**C.     NEPA Process/FEIS**

44.     FEMA acted as the lead federal agency that prepared the FEIS in accordance with the Council on Environmental Quality's ("CEQ") NEPA implementing regulations in Title 40 Code of Federal Regulations Parts 1500 through 1508 and FEMA's NEPA procedures in 44 C.F.R. Part 10 and DHS Directive and Instruction 023-01, "Implementation of the National Environmental Policy Act."  (Executive Summary of FEIS at ES-5; 42 U.S.C. §§ 4321–4347.)

45.     In January 2008, FEMA published a Notice of Availability for a Draft Environmental Assessment ("EA") for the University's vegetation management activities proposed in grant application PDMC-PJ-09-CA-2005-011 on the Strawberry Canyon project area for public comment.  (FEIS § 1.2 [Introduction] at 1-5.)

46.     On June 10, 2010, FEMA published a Notice of Intent ("NOI") to prepare an EIS for the entire Project in the *Federal Register* pursuant to 40 C.F.R. 1501.7.  (FEIS § 1.6 [Public Involvement] at 1-8.)

47.     As the lead agency, FEMA determined that all proposed vegetation management work included in the four grant applications should be assessed in the same EIS as a single project. (FEIS § 3.4.2 at 3-9.)  This determination was based on the proximity of the project areas to each other and the potential for cumulative impacts.  (40 C.F.R. § 1508.25.)

48.     A public scoping period for the EIS extended from June 10, 2010 through October 1, 2010, and included two public scoping meetings in August 2010.  (*Id.*)

49.     On June 11, 2010 and October 15, 2010, FEMA sent participation letters to the USFWS and NOAA notifying them that FEMA would be developing a biological assessment in accordance with the Endangered Species Act ("ESA") for the Project.  (FEIS § 7.5 [Public Participation & Coordination] at 7-6.)

50.     On September 5, 2012, FEMA transmitted the biological assessment to the USFWS and NOAA, initiating formal consultation under Section 7(a)(2) of the ESA on the proposed hazardous fire risk reduction methods in the proposed and connected project areas.  (*Id.*)

51.     A Notice of Availability ("NOA") of the draft EIS was published in the *Federal Register* on May 3, 2013, and the public comment period extended from May 3, 2013 to June 17, 2013.  (*See* FEIS § 1.6 [Public Involvement] at 1-9.)

52.     FEMA considered five preliminary alternatives to the Project in the draft EIS.  (*See* FEIS § 3.1 [Preliminary Alternatives] at 3-1.)  Of those five alternatives, one included "[p]artially funding the grant applications, including funding some grant projects and denying others." (*Id.*) However, only two alternatives were carried forward for detailed analysis in the draft EIS:  the No Action Alternative and the Project.  (*Id.* at 3-8.)

53.     In analyzing the No Action Alternative, FEMA evaluated the environmental consequences of not funding any of the proposed grant applications.  FEMA concluded that, even if the University, Oakland and the Park District continued their current fire reduction activities, "hazardous fire risk reduction is not considered an effective outcome of the no action alternative." (FEIS § ES.7.1 [No Action Alternative].)  FEMA also determined that the No Action Alternative could result in greater potential environmental impacts in several resource categories, including biological resources; fire and fuels; soils; water resources; air quality; climate and microclimate; historic properties; aesthetics and visual quality; socioeconomics; health and human safety; public services, utilities and recreation; and transportation.  (*See* FEIS § ES.8 [Table ES-4].)

54.     On May 10, 2013, the USFWS issued a Biological Opinion for the Project that included the incidental take statement, required terms and conditions, and a finding that the Project would not result in the jeopardy of a listed species.   (FEIS § 5.1.6.2 at 5.1-20.)

55.     NOAA issued a letter of concurrence in April 2013 that the proposed and connected actions were not likely to adversely affect listed species under its jurisdiction.  (FEIS § 7.5 at 7-6.)

56.     FEMA held three public meetings near the Project area and received over 13,000 comment submittals on the Project.  (*Id.*)

57.     FEMA finalized the Project's Environmental Impact Statement in November 2014.  (FEIS § 1.6 [Introduction] at 1-9.)  The FEIS was supported by an extensive administrative record, including over 8,500 pages of technical analyses and other referenced or relied upon documents.

58.     On December 5, 2014, FEMA published a NOA of the FEIS in the *Federal Register* with a comment period ending January 7, 2015.  (*See* Environmental Impact Statements, 79 Fed. Reg. 234 (December 5, 2014).)

59.     The FEIS expressly stated that "[s]hould FEMA decide not to fund all four applications, a supplement to the EIS would have to be prepared to assess the positive and negative effects of the decision." (*Id.*)

60.     On February 26, 2015, after more than a decade of inter-agency cooperation, technical analysis, and robust public review of the Project, FEMA issued the ROD to document its

/ / /

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

decision to approve the Project and fund all four grant applications that would further the agency's mission of reducing severe fire risk in the study area.

61.    The ROD defines the Project to include *all* of the work proposed in the four grant applications by the University, Oakland, and EBRPD.  (ROD at 1.)

62.    Consistent with the environmental analysis in the FEIS, the ROD stated that if FEMA did not fund *all* of the proposed grant applications for wildlife management in the East Bay Hills, the local agencies' individual vegetation management activities "would not result in effective hazardous fire risk reduction along the wildland-urban interface of the East Bay Hills." (ROD at 3.)

63.    The FEMA Regional Administrator's decision to approve the Project, as expressly stated in the ROD, constituted a final decision in accord with the regulations at 44 C.F.R. § 10.

64.    The ROD required each sub-recipient to finalize a Mitigation Management Plan ("MMP") that includes annual monitoring, reporting, and adaptive management if performance goals are not met.  (ROD at 11.)

65.    Grant eligibility was only negatively affected if a sub-recipient failed to comply with the MMPs, the agreed upon measures contained in such MMPs, the Terms and Condition of the Biological Opinion issued by USFWS, the terms and conditions established by NMFS in their "Not Likely to Adversely Affect" concurrence, or with any other measure established in the FEIS. (*Id.*)  The ROD stated, "any violation of the above conditions may jeopardize funding for the grants." (*Id.*)

66.    On March 27, 2015, FEMA notified Cal OES that it had granted approval for the University's Strawberry Canyon project, and authorized grant funds of $282,828.

67.    FEMA similarly notified Cal OES on March 27, 2015, that it had granted approval of the University's Claremont Canyon project, and authorized grant funds of $291,000.

68.    FEMA advised that the Project was to be completed in 10 years, and noted March 27, 2025 as the project activity completion date.  The notification letter also advised that any additions or amendments to the approved statement of work would require NEPA sign-off, including review by all state and federal agencies participating in the NEPA process.

69.    The University provided written confirmation of its commitment to the conditions of the two PDM grants on April 23, 2015.

70.    The University promptly commenced planning efforts to move forward with the fire risk reduction work on the UCB campus.

71.    FEMA subsequently disbursed funds to Cal OES to be distributed to the University, the City of Oakland, and EBRPD.

72.    On June 23, 2016, in reliance upon the approved and disbursed grant funding, the University approved the implementation of the Project, as well as additional environmental documentation ("Addendum") prepared pursuant to the California Environmental Quality Act ("CEQA").

73.    Following approval of the Project and compliance with CEQA, the University prepared to commence vegetation removal work in September 2016.

74.    At all times relevant herein, the University has complied with all conditions imposed upon the sub-recipients for PDM grant funding.

**D.    Termination of The University's PDM Grants**

75.    A community group known as Hills Conservation Network ("HCN") filed a lawsuit on or about March 6, 2015, in United States District Court for the Northern District of California against FEMA, Cal OES, and the Grantees, referenced as *Hills Conservation Network v. Federal Emergency Management, et al.*, N.D. Cal. Case No. 3:15-cv-01057-LB ("HCN Action").  The HCN Action challenges FEMA's compliance with NEPA and the APA in approving the Project and awarding the related grant funding.

76.    On July 19, 2016, representatives of FEMA and Cal OES met with the University and advised that FEMA was considering termination of the University's PDM grants.

77.    FEMA, Cal OES and HCN filed a Joint Motion to Vacate Hearing Date on Cross-Motions for Summary Judgment in the HCN Action on August 1, 2016.  In that Joint Motion, those parties asserted "HCN, FEMA, and Cal OES have been engaged in productive settlement negotiations that will fully resolve the claims in this litigation and lead to dismissal of the case."

/ / /

78.     On August 8, 2016, FEMA, Cal OES and HCN filed a joint brief in the HCN Action stating:  "FEMA, HCN and Cal OES want to clarify for the Court that the settlement framework which has been agreed to by HCN; is being recommended by Cal OES; and which is being recommended by FEMA staff to its senior management and to the Department of Justice includes terminating the funding of grants for the UCB and Defendant City of Oakland projects."

79.     All parties to the HCN Action filed a Joint Case Management Statement on September 1, 2016.  In that Joint Statement, the parties advised the Court that "FEMA has recommended the proposed settlement to the U.S. Department of Justice.  The proposed settlement requires review by various officials and ultimate approval by the Assistant Attorney General of the Environment and Natural Resources Division.  The United States expects to have a final decision whether to approve the proposed settlement by September 28."  The Joint Statement also states "The University of California has not joined the settlement, and opposes the proposal to terminate the grant funding to the University.  The University of California reserves all rights to object to the settlement and/or dismissal of this action."

80.     On September 6, 2016, FEMA sent a letter to Cal OES, stating the grant awarded to the University for the Claremont Canyon sub-area "is hereby terminated."   The purported termination was based upon "an agreement between FEMA and Cal OES to terminate the grant, pursuant to 2 C.F.R. §200.339(a)(3)."  In this same letter, FEMA also asserted that the Incidental Take Statement issued by the USFWS no longer covered any of the activity proposed for funding by the terminated grants.

81.     FEMA sent a nearly identical letter to Cal OES on September 6, 2016, stating that the grant awarded to the University for the Strawberry Canyon sub-area "is hereby terminated."

82.     On or about September 7, 2016, Cal OES transmitted FEMA's September 6, 2016 letters to the University.

83.     The USFWS has advised the University that, based on FEMA's termination of the PDM grants to the University, USFWS will require the University to obtain an incidental take permit pursuant to Section 10 of the Endangered Species Act.

/ / /

84.     Accordingly, FEMA's illegal termination of the PDM grants to the University has substantially delayed the University's ability to move forward with the Project at this time.

85.     FEMA's illegal termination of the PDM grants may prevent the University from performing the fire risk mitigation work, or further delay that work for multiple years.

86.     On September 16, 2016, the University notified FEMA in writing that, pursuant to 2 C.F.R. § 200.339(a)(3), the University, as the non-Federal entity, did not consent to the termination of the grant awards.  Further, the University advised FEMA that the termination of the PDM grants was illegal and improper.

87.     Counsel for FEMA advised all parties in the HCN Action on September 16, 2016, that "The United States has approved and signed the Settlement Agreement resolving the *Hills Conservation Network* case."

88.     On September 20, 2016, HCN filed a Notice of Settlement with the Court, and requested a dismissal of the HCN Action.

89.     On September 20, 2016, the Regional Administrator signed the Amended ROD without public notice or comment ("Amended ROD").

90.     The Amended ROD states that FEMA determined to terminate the PDM grant funding for the Project previously awarded to the University for Claremont Canyon and Strawberry Canyon.

91.     In a footnote, the Amended ROD states that "[t]he Draft and Final EIS and initial ROD are incorporated into this AmendedROD [sic] by reference."  (Amended ROD at 1, fn.1.)

92.     The Amended ROD does not contain any analysis or findings pursuant to NEPA.

93.     FEMA also failed to evaluate the potential environmental impacts identified in the FEIS and the ROD that could result from FEMA's decision to fund only a portion of the Project, including the delay in implementing hazardous fire risk reduction work on the University and Oakland properties.

94.     The Amended ROD is entirely at odds with the analyses and conclusions in the FEIS that expressly state moving forward with the Project in its entirety is the most effective hazardous fire risk reduction strategy in the East Bay Hills.

95.     The Amended ROD and the administrative record contradict the assertion in the letters from FEMA to Cal OES dated September 6, 2016, asserting that "no federal action is associated with these projects."

96.     On September 28, 2016, FEMA sent Cal OES Director Ghilarducci a letter re-affirming FEMA's decision to terminate grants PDMC-PJ-09-CA-2005-003 and PDMC-PJ-09-CA-2005-011.

97.     Cal OES forwarded to counsel for the University on September 29, 2016, FEMA's September 28, 2016 letter regarding PDMC-PJ-09-CA-2005-003.

98.     On October 4, 2016, Cal OES forwarded to counsel for the University FEMA's September 28, 2016 letter regarding PDMC-PJ-09-CA-2005-011.

99.     The Court dismissed the HCN Action with prejudice on October 17, 2016.

100.    On February 2, 2017, based on FEMA's unilateral termination of funding and revocation of the related ESA permit, the UCB Chancellor rescinded the June 23, 2016 approval of the Project and the related CEQA Addendum to support the implementation of the Project.

**FIRST CAUSE OF ACTION**

**(Violation of APA – Failure to Comply with Federal Regulations under Stafford Act)**

101.    The University re-alleges, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

102.    The PDM grant program established by the Stafford Act is subject to the federal regulations set forth at 2 C.F.R. § 200.300 *et seq.*  (*See* 31 U.S.C. § 503.)

103.    Termination of federal grants is governed by 2 C.F.R. § 200.339.

104.    FEMA asserted that FEMA and Cal OES agreed to terminate portions of the two PDM grants pursuant to 2 C.F.R § 200.339(a)(3).

105.    The cited federal regulation only authorizes termination of a federal award "[b]y the Federal awarding agency or pass-through entity **with the consent of the non-Federal entity,**

/ / /

1  in which case the two parties must agree upon the termination conditions, including the effective

2  date." (*See* 2 C.F.R § 200.339(a)(3) (emphasis added).)

3     106. Cal OES is the pass-through entity that disburses grant funding to the University.

4     107. FEMA's recent guidance for the PDM program defines a pass-through entity as

5  "[a] non-Federal entity that provides a subaward to a subrecipient to carry out part of a Federal

6  program." (*See* Hazard Mitigation Assistance Guidance (February 27, 2015), *available at*

7  https://www.fema.gov/media-library/assets/documents/103279 (emphasis added).)

8     108. These same guidelines define a non-Federal entity as "[a] State, local government,

9  federally-recognized tribe, or private nonprofit organization that *carries out a Federal award* as a

10  recipient or subrecipient," (*See id.* (emphasis added).)

11     109. Here, the University is the non-Federal entity that will carry out the Project

12  activities using the federal award.

13     110. Cal OES has no role in implementing the Project activities and is therefore not the

14  non-Federal entity for the purposes of 2 C.F.R § 200.339(a)(3)**.**

15     111. The University is therefore the non-Federal entity whose consent is required for

16  termination of the PDM grants.

17     112. The University did not consent to the termination of the PDM grants.

18     113. Upon receipt of notification of FEMA's improper and illegal attempt to terminate

19  the PDM grant funding, the University submitted written objections on September 16, 2016,

20  confirming that the University did not consent to the termination of the PDM grants.

21     114. On September 20, 2016, FEMA issued the Amended ROD, which states regarding

22  the two University PDM grants that, "FEMA, in coordination with Cal OES, has determined that

23  this grant is no longer in the best interest of the government." (Amended ROD at 2.)

24     115. On or about September 28, 2016, FEMA sent letters to Cal OES responding to the

25  University's written objections to the purported grant termination.  In those letters, FEMA re-

26  affirmed its termination of the PDM grants without the consent of the University.

27     116. The University has invoked and exhausted any and all available administrative

28  remedies and no further administrative appeal is necessary.

117.    This matter is now ripe for federal judicial review of final agency action.

118.    FEMA failed identify any other grounds for its purported termination of the University's PDM grants.

119.    FEMA failed to comply with federal regulations under the Stafford Act by unilaterally terminating the PDM grants based on an agreement between FEMA and Cal OES, but *without* consent from the University as the non-Federal entity pursuant to 2 C.F.R § 200.339(a)(3).

120.    FEMA's failure to comply with the applicable federal regulations is arbitrary and capricious, not in accordance with law, and without observance of procedure required by law under the APA.  (*See* 5 U.S.C. §§ 701-706.)

121.    FEMA's unilateral decision to terminate the University's PDM grants for the purpose of resolving litigation against the agency is inconsistent with FEMA's statutory obligations under the Stafford Act.

122.    FEMA's failure to obtain the University's consent and/or provide any procedural due process prior to or after the termination of the PDM grants is entirely inconsistent with FEMA's statutory authority under the Stafford Act.

123.    The University incurred substantial costs to pursue and obtain the PDM grants, and to comply with all conditions thereto.  These costs include, but are not limited to, the attorney fees and litigation costs incurred in the HCN Action, as well as consultant fees and other costs incurred in preparing to implement the Project as approved in the ROD.

124.    The University is entitled to declaratory and/or injunctive relief to redress FEMA's violation of the APA and the Stafford Act.


**SECOND CAUSE OF ACTION**

**(Violation of APA – Arbitrary and Capricious Amendment of ROD)**

125.    The University re-alleges, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

/ / /

/ / /

126.    On September 20, 2016, Defendant Fenton signed the Amended ROD effectively terminating all of the PDM grant funding under the Project that was submitted by, and approved for, the University.

127.    FEMA issued the Amended ROD without public notice and comment and without complying with the requirements of NEPA.

128.    In issuing the Amended ROD, FEMA disregarded and undermined the express analyses and findings in the FEIS and ROD that funding all four grants was the environmentally preferred alternative, and that funding of individual grant applications "would not result in effective hazardous fire risk reduction along the wildland-urban interface of the East Bay Hills."

129.    The Amended ROD states that "[t]he Regional Administrator's decision to amend the ROD constitutes the final decision by FEMA in accord with the regulations at 44 CFR Part 10. Any challenge of this decision, including the authorization of grant funding must be brought in federal district court."

130.    The University has invoked and exhausted any and all available administrative remedies and no further administrative appeal is necessary.

131.    This matter is now ripe for federal judicial review of final agency action.

132.    Based on the above facts and legal obligations, demonstrating improper interference and influence over the NEPA decision making process, and a lack of any rational connection between the facts and evidence in the administrative record and the decision reached by FEMA to unilaterally terminate some of the PDM grant awards for the Project, FEMA's Amended ROD is arbitrary and capricious, not supported by substantial evidence, not in accordance with law, and without observance of procedure required by law under the APA.  (*See* 5 U.S.C. §§ 701-706.)

133.    The University is entitled to declaratory and/or injunctive relief against FEMA for its improper and illegal amendment of the ROD.

/ / /

/ / /

/ / /

**THIRD CAUSE OF ACTION**

**(Violation of NEPA – Failure to Prepare Supplemental FEIS)**

134.     The University re-alleges, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

135.     FEMA failed to comply with the procedural and substantive requirements of NEPA prior to issuing the Amended ROD or terminating the PDM grants to the University.

136.     The Amended ROD and termination of the PDM grants was arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law for the following reasons:

        a.     The FEIS only analyzed environmental impacts for the entire Project, consisting of all four grant applications.

        b.     The FEIS did not analyze the potential impacts of proceeding with only the Park District's portion of the Project.

        c.     The FEIS expressly notes that "should FEMA decide not to fund all four applications," a supplemental EIS is necessary in order to assess the environmental impacts of a reduced project.

        d.     The FEIS concluded that not moving forward with the Project could result in potentially significant environmental impacts to several resource categories, including biological resources; fire and fuels; soils; water resources; air quality; climate and microclimate; historic properties; aesthetics and visual quality; socioeconomics; health and human safety; public services, utilities and recreation; and transportation.

        e.     FEMA's Amended ROD was a substantial change to the proposed action that may result in new significant environmental impacts that were not evaluated in the FEIS.

        f.     An EIS must be supplemented when "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns."   (40 C.F.R. § 1502.9(c)(1)(i).)

        g.     FEMA's failure to prepare a supplement to the FEIS that thoroughly considers the environmental impacts of terminating certain grant applications undermines NEPA's

fundamental purpose of ensuring that federal agencies take a "hard look" at "the environmental consequences of their actions, early enough so that it can serve as an important contribution to the decision making process."  (*See California v. Norton,* 311 F.3d 1162, 1175 (9th Cir. 2002).)

137.    The University has invoked and exhausted any and all available administrative remedies and no further administrative appeal is necessary.  This matter is now ripe for Federal judicial review of final agency action.

138.    Accordingly, FEMA's Amended ROD is arbitrary and capricious, not in accordance with law including NEPA, and without observance of procedure required by law under the APA.  (*See* 5 U.S.C. §§ 701-706.)

139.    The University is entitled to declaratory and/or injunctive relief against FEMA for its improper and illegal violation of NEPA in adopting the Amended ROD.

## **PRAYER FOR RELIEF**

WHEREFORE, the University respectfully requests that the Court:

1.     Issue a declaratory judgment that FEMA's termination of the PDM grants to the University violated and is violating the Stafford Act, NEPA and the APA;

2.     Issue a declaratory judgment that the Amended ROD prepared by FEMA in connection with its decision to terminate funding for the Project violated and is violating the Stafford Act, NEPA and the APA;

3.     Determine and declare that FEMA's Amended ROD terminating the PDM grant constituted an unlawful post-decision modification of the ROD;

4.     Preliminarily and permanently enjoin FEMA from terminating the PDM grants to the University, implementing the Amended ROD, or re-distributing any funds originally approved for the Project as a whole, unless and until such time as FEMA complies fully with the requirements of NEPA, that statute's implementing regulations, and this Court's order, specifically requiring preparation of a supplemental EIS;

/ / /

/ / /

5.    Award the University its litigation and other costs (including reasonable attorney, witness and consultant fees) under the Equal Access to Justice Act, 28 U.S.C. § 2412 and Fed. R. Civ. Proc. 54(d), and/or under any other statutory authority of the Court; and

6.    Award such other relief as this Court deems appropriate, just, and proper.

DATED: June 14, 2017          MEYERS, NAVE, RIBACK, SILVER & WILSON

By:      /S/
        Shiraz D. Tangri
        Attorneys for Plaintiff
        THE REGENTS OF THE
        UNIVERSITY OF CALIFORNIA

2814839.5