UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>               Plaintiff,<br><br>   v.<br><br>FEDERAL EMERGENCY MANAGEMENT AGENCY, et al.,<br><br>             Defendants. | Case No. 17-cv-03461-LB<br><br>**ORDER GRANTING MOTIONS TO DISMISS CASE AS MOOT**<br><br>Re: ECF Nos. 120, 123–125, 127 |

## INTRODUCTION

In 2005, the Regents of the University of California submitted two applications to the

California Governor's Office of Emergency Services ("Cal OES") for grant funding from the

Federal Emergency Management Agency ("FEMA") to mitigate the risk of wildfires in the East

Bay Hills. The funding was for two areas: a 42.8-acre area in Claremont Canyon and a 56.3-acre

area in Strawberry Canyon. The forest in those areas has an "understory"[1] of native trees and

---

[1] "Understory" refers to "[t]he (layer of) vegetation growing beneath the level of the tallest trees in a forest." *Understory*, Oxford English Dictionary (2019), *available at* https://www.oed.com/view/Entry/212113 (last visited Dec. 20, 2019).

shrubs growing beneath an "overstory"[2] canopy of non-native trees, particularly eucalyptus trees, that are vulnerable to fire. The University's project would eradicate the non-native overstory by cutting down all of the non-native trees (including all eucalyptus, Monterey pine, and acacia trees) to convert the area into a forest of native California species that would be more resistant to fire.

FEMA conducted an environmental review under the National Environmental Policy Act ("NEPA"). Among other things, FEMA consulted with the U.S. Fish and Wildlife Service. The Fish and Wildlife Service issued a Biological Opinion that the project might have short-term adverse effects on the Alameda whipsnake, which is listed as threatened under the Endangered Species Act, and would also have long-term benefits by eradicating eucalyptus trees (which are unsuitable for the whipsnake), thereby creating new habitat areas for the whipsnake. The Fish and Wildlife Service issued an "incidental-take statement" (or "incidental-take permit") authorizing the University to engage in limited "incidental take" (meaning, harassment, injury, or death) of the whipsnake and other listed species in connection with the project.

In 2014, FEMA issued a final Environmental Impact Statement documenting its environmental review. FEMA, in conjunction with the University, modified the project to implement a "unified methodology": (1) for 22.1 of the 99.1 total acres at issue, the University would emphasize "thinning" the understory (by removing shrubs and low tree branches) instead of cutting down the non-native-tree overstory, and (2) for the remaining acres, the University would implement its plan to cut down non-native trees. In 2015, FEMA granted $573,828 in funding to the University for the project.

A non-profit organization called the Hills Conservation Network ("HCN") filed several suits to block the project. HCN contended that the University's plan to cut down non-native trees (and spread wood chips from those trees at the project sites) would increase, not decrease, fire risk. Instead, HCN said that removing understory vegetation, not cutting down the overstory, was a

---

[2] "Overstory" refers to "[t]he highest level of vegetation in a forest or woodland, usually the canopy-forming trees." *Overstory*, Oxford English Dictionary (2019), *available at* https://www.oed.com/view/Entry/135157 (last visited Dec. 20, 2019).

better and more cost-effective way to mitigate fire risk. HCN argued that FEMA should have required that approach for the entire project area.

HCN first sued FEMA, the director of Cal OES, and the University (among other defendants) in federal court, alleging that FEMA violated NEPA by not adequately considering HCN's alternative as part of its environmental review of the University's project. *Hills Conservation Network v. FEMA*, No. 3:15-cv-01057-LB (N.D. Cal. filed Mar. 6, 2015) (*Federal HCN*). In September 2016, FEMA and Cal OES settled the *Federal HCN* lawsuit, over the University's objections, by agreeing to rescind the grants for the University's project.

HCN also sued the University in state court, alleging that the University violated the California Environmental Quality Act ("CEQA") by not adequately conducting its own environmental review of its project. *Hills Conservation Network, Inc. v. Regents of the Univ. of Cal.*, No. RG16823477 (Cal. Super. Ct. Alameda Cty. filed July 15, 2016) (*State HCN*). In October 2016, the state court enjoined the University's project on the ground that HCN had a likelihood of success on the merits of its claim that the University violated CEQA.

In February 2017, the University rescinded its approval for its original project — which allowed it to stipulate to dismissal of the *State HCN* lawsuit on the ground that it was "potentially moot." The University moved forward instead with a "Revised Project," funded by a $3,621,000 grant from the California Department of Forestry and Fire Protection ("Cal Fire"). The Revised Project involves selective thinning and understory removal throughout the area covered by the FEMA project (among other areas) and not cutting down non-native trees and removing the overstory canopy as its original project had called for. The University is pursuing a full environmental review of the Revised Project for CEQA compliance.

In June 2017, the University filed this lawsuit against FEMA, Cal OES, and several FEMA and Cal OES officials. The University claims that FEMA's decision to terminate the grants for its original Claremont Canyon and Strawberry Canyon project (1) failed to comply with the regulations under the Robert T. Stafford Disaster Relief and Emergency Assistance Act ("Stafford Act") and thus violated the Administrative Procedure Act ("APA"), (2) was arbitrary and capricious and thus violated the APA, and (3) failed to comply with the procedural and substantive

requirements of NEPA. HCN intervened as an additional defendant. Another FEMA grant recipient (that retained grant funding) — the East Bay Regional Park District ("Park District") — also intervened as an additional defendant.

The parties all filed dispositive cross-motions. The University moved for summary judgment, arguing that FEMA's actions in terminating the grants for its original project violated the APA and NEPA.[3] FEMA moved to dismiss, arguing that (1) the University lacks standing because there is no causation or redressability, (2) the case is moot because the University itself rescinded its approval for the FEMA project and is now pursuing the Revised Project, and (3) its sovereign immunity bars the University's claims.[4] FEMA also cross-moved for summary judgment on the grounds that (1) it legally terminated the grants because Cal OES (the main grant recipient) consented to the termination and the University (as a subgrantee) does not need to consent and (2) it complied with the APA and NEPA when it terminated the grants.[5] HCN joined in FEMA's motions.[6] The Director of Cal OES[7] (1) moved to dismiss, arguing that the Eleventh Amendment bars the University's claims against him, and (2) cross-moved for summary judgment, arguing, like FEMA, that their mutual consent to terminate the grants was lawful.[8][9] The Park District cross-moved for summary judgment on the ground that this case should not alter or vacate FEMA's grant funding for the Park District's project.[10]

---

[3] Univ. Mot. – ECF No. 120. The University is not asking the court to order FEMA to award grant funding in any specific matter; instead, it asks the court to order FEMA to comply with NEPA and all applicable regulations before it terminates any grants. *Id.* at 20. Citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[4] FEMA Opp'n and Cross-Mot. – ECF No. 123.

[5] *Id.*

[6] HCN Joinder – ECF No. 125.

[7] The parties stipulated to dismissing Cal OES as a defendant, leaving only the Director of Cal OES, sued in his official capacity, as a state defendant. Stipulation of Dismissal – ECF No. 30.

[8] Ghilarducci Opp'n and Cross-Mot. – ECF No. 124.

[9] *Id.*

[10] Park District Opp'n and Cross-Mot. – ECF No. 127.

The court dismisses the case as moot. The University affirmatively rescinded its approval for the FEMA project to cut down the non-native-tree overstory and now is implementing a Cal Fire-funded Revised Project to thin the forest and remove understory. FEMA's grants and the related items (e.g., the incidental-take statement) were for the FEMA project and cannot be transferred to the Revised Project. Consequently, a court order finding that FEMA erred in rescinding the University's grants for the original project would not afford the University any effective relief because the University is instead pursuing the Revised Project. This mooted the *State HCN* lawsuit, and it moots this lawsuit too.

## STATEMENT

### 1. Statutory, Regulatory, and Administrative Background

#### 1.1    FEMA Grant Programs

Under the Stafford Act, FEMA administers numerous grant programs, including the Pre-Disaster Mitigation Program authorized by 42 U.S.C. § 5133 and the Hazard Mitigation Grant Program authorized by 42 U.S.C. § 5170c.

The Pre-Disaster Mitigation Program was established "to provide technical and financial assistance to States and local governments to assist in the implementation of predisaster hazard mitigation measures that are cost-effective and are designed to reduce injuries, loss of life, and damage and destruction of property, including damage to critical services and facilities under the jurisdiction of the States or local governments." 42 U.S.C. § 5133(b). The Hazard Mitigation Grant Program allows for federal funding when authorized under a presidential declaration that a major disaster exists. 42 U.S.C. §§ 5170, 5170c.

According to FEMA guidance, states, territories, and federally recognized tribes (including the emergency-management agencies or similar offices of states, territories, and federally recognized tribes) are eligible to be "Applicants" to the Pre-Disaster Mitigation Program and the Hazard

Mitigation Grant Program.[11] (Cal OES is the Applicant to FEMA for the state of California.[12]) Entities that are not states, territories, or federally recognized tribes cannot be Applicants, but they can submit subapplications for FEMA assistance to their Applicant state, territory, or federally recognized tribe.[13] Applicants are responsible for soliciting subapplications from eligible subapplicants and assisting in the preparation of, reviewing, and submitting eligible, complete applications to FEMA.[14]

If FEMA awards grant funding, the Applicant then becomes both the "Recipient" of the grant funds and a "pass-through entity." 2 C.F.R. § 200.86 ("Recipient means a non-Federal entity that receives a Federal award directly from a Federal awarding agency to carry out an activity under a Federal program. The term recipient does not include subrecipients."); 2 C.F.R. § 200.74 ("Pass-through entity means a non-Federal entity that provides a subaward to a subrecipient to carry out part of a Federal program.").[15] Pass-through entities are accountable for the use of the funds and are responsible for administering the grant, for complying with program requirements and all other applicable laws and regulations, and for financial management of the program and for overseeing all approved projects.[16] Subapplicants, in turn, become "Subrecipients." 2 C.F.R. § 200.93 ("Subrecipient means a non-Federal entity that receives a subaward from a pass-through entity to carry out part of a Federal program; but does not include an individual that is a beneficiary of such program. A subrecipient may also be a recipient of other Federal awards directly from a Federal

---

[11] FEMA, Dep't of Homeland Sec., *Hazard Mitigation Assistance Guidance* (Feb. 27, 2015) – Admin. Record ("AR") 17.1.1-010 at 16, 36 (pp. 5, 25).

[12] McCord Decl. – ECF No. 123-2 at 2 (¶ 4); *accord* FEMA, Dep't of Homeland Sec., *Final Hazardous Fire Risk Reduction Environmental Impact Statement[:] East Bay Hills, California* (Nov. 2014) ("Final EIS") – AR 10.1-010 at 3 (p. ES-3).

[13] *Hazard Mitigation Assistance Guidance* – AR 17.1.1-010 at 16, 18 (pp. 5, 7).

[14] *Id.*

[15] *Accord id.*

[16] *Id.*

awarding agency.").[17] Subrecipients are responsible for managing their subawards and for complying with program requirements and all other applicable laws and regulations.[18]

Federal regulations provide that grant funding may be terminated in whole or in part "[b]y the Federal awarding agency or pass-through entity with the consent of the non-Federal entity, in which case the two parties must agree upon the termination conditions, including the effective date and, in the case of partial termination, the portion to be terminated[.]" 2 C.F.R. § 200.339(a)(3).[19]

The Stafford Act provides that "[t]he Federal Government shall not be liable for any claim based upon the exercise or performance of or the failure to exercise or perform a discretionary function or duty on the part of a Federal agency or an employee of the Federal Government in carrying out the provisions of this chapter." 42 U.S.C. § 5148.

### 1.2    The National Environmental Policy Act

Under NEPA, federal agencies generally are required to prepare an Environmental Impact Statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment[.]" 42 U.S.C. § 4332(c).[20] Federal agencies must rigorously explore and objectively evaluate all reasonable alternatives (including the alternative of "no action") and devote "substantial treatment" to each alternative considered in detail. 40 C.F.R. § 1502.14. Federal agencies must prepare draft Environmental Impact Statements concurrently with and integrated

---

[17] *Accord id.* at 16–17 (pp. 5–6).

[18] *Id.* at 17 (p. 6).

[19] *Accord id.* at 94 (p. 83). The parties dispute here whether Cal OES (the Recipient state and a "pass-through entity") or the University (the Subrecipient) is the "non-Federal entity" that must consent in order for FEMA to terminate the grant. The parties have not identified any case, statute, regulation, or guidance that directly addresses this issue.

[20] Not every project requires an Environmental Impact Statement. "[I]f . . . an agency's regulations do not categorically require the preparation of an EIS, then the agency must first prepare an EA [Environmental Assessment] to determine whether the action will have a significant effect on the environment." *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000) (citing 40 C.F.R. § 1501.4; *Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1356 (9th Cir. 1994)). "If, in light of the EA, the agency determines that its action will significantly affect the environment, then an EIS must be prepared; if not, then the agency issues a [Finding of No Significant Impact]." *Id.* (citing 40 C.F.R. §§ 1501.4, 1508.9; *Salmon River*, 32 F.3d at 1356). "If an agency decides not to prepare an EIS, it must supply a 'convincing statement of reasons' to explain why a project's impacts are insignificant." *Id.* (some internal quotation marks omitted) (quoting *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir. 1998)).

with environmental-impact analyses and related surveys and studies required by other federal statutes, including the Endangered Species Act. 40 C.F.R. § 1502.25(a).

"'NEPA does not provide substantive protections, only procedural ones[.]'" *Friends of the Santa Clara River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906, 913 (9th Cir. 2018) (quoting *Conservation Cong. v. Finley*, 774 F.3d 611, 615 (9th Cir. 2014)). "Although a court must 'insure that the agency has taken a hard look at environmental consequences,' a court cannot 'interject itself within the area of discretion of the executive as to the choice of the action to be taken.'" *Id.* (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)). As another court in this district observed, "[o]nce the agency does the required hard look, it is free to choose to proceed with action that will have an adverse impact on the environment, at least insofar as NEPA is concerned, the idea being that if we are going to destroy the environment, we should do so with ou[r] eyes wide open and not by accident." *Bair v. Cal. State Dep't of Transp.*, 867 F. Supp. 2d 1058, 1065 (N.D. Cal. 2012).

"'Because NEPA does not provide for a private right of action, plaintiffs challenging an agency action based on NEPA must do so under the Administrative Procedure Act[.]'" *Nuclear Info. and Res. Serv. v. Nuclear Regulatory Comm'n*, 457 F.3d 941, 950 (9th Cir. 2006) (quoting *Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 939 (9th Cir. 2005)).

### 1.3 The California Environmental Quality Act

Under CEQA, public agencies within the state of California, such as the University, are required to "prepare, or cause to be prepared by contract, and certify the completion of, an environmental impact report on any project which they propose to carry out or approve that may have a significant effect on the environment." Cal. Pub. Res. Code §§ 21100(a), 21151(a). An Environmental Impact Report ("EIR") must describe a range of reasonable alternatives (including the alternative of "no project"), must evaluate the comparative merits of the alternatives, and must include sufficient information about each alternative to allow "meaningful evaluation, analysis, and comparison with the proposed project." Cal. Code Regs. tit. 14, § 15126.6. Once an Environmental Impact Report has been prepared for a project, a subsequent or supplemental Environmental Impact Report is required if substantial changes are proposed to the project or the

circumstances under which the project is being undertaken (or other new information arises) that will require major revisions of the Environmental Impact Report. Cal. Pub. Res. Code § 21166. If the agency decides to prepare an addendum to a previously certified Environmental Impact Report, as opposed to a subsequent Environmental Impact Report, it must provide a brief explanation of its decision not to prepare a subsequent Environmental Impact Report, supported by substantial evidence. Cal. Code Regs. tit. 14, § 15164(e).

CEQA differs from NEPA in that while both acts impose procedural requirements of preparing environmental-impact reports, CEQA (unlike NEPA) also contains "'a substantive mandate that public agencies refrain from approving projects for which there are feasible alternatives or mitigation measures.'" *Friends of the Santa Clara River*, 887 F.3d at 914 n.5 (quoting *Mountain Lion Found v. Fish and Game Comm'n*, 16 Cal. 4th 105, 134 (1997)).

"[C]itizens have standing to bring suits to enforce CEQA." *Town of Atherton v. Cal. High-Speed Rail Auth.*, 228 Cal. App. 4th 314, 340 (2014) (citing *Rialto Citizens for Responsible Growth v. City of Rialto*, 208 Cal. App. 4th 899, 912–16 (2012)).

### 1.4 The Endangered Species Act

Section 9 of the Endangered Species Act prohibits the "take"[21] of any listed endangered species of fish or wildlife. 16 U.S.C. § 1538. "Notwithstanding that prohibition, private parties . . . may obtain authorization for 'incidental take' of listed species in two ways: (1) through Section 7, for projects authorized, funded, or carried out by a federal agency; or (2) through Section 10, for projects carried out entirely by the private party." *Defenders of Wildlife v. U.S. Fish and Wildlife Serv.*, No. 16-CV-01993-LHK, 2016 WL 4382604, at *1 (N.D. Cal. Aug. 17, 2016); *accord Ramsey v. Kantor*, 96 F.3d 434, 439 (9th Cir. 1996).

"Specifically, Section 7(a)(2) governs federal agency actions in which 'there is discretionary Federal involvement or control.'" *Defenders of Wildlife*, 2016 WL 4382604, at *1 (citing 50 C.F.R. § 402.03). "Under Section 7, a federal agency must 'insure that any action authorized,

---

[21] As used in the Endangered Species Act, "[t]he term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

funded, or carried out by such agency is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of critical habitat of such species.'" *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 698 F.3d 1101, 1107 (9th Cir. 2012) (internal brackets and ellipsis omitted) (quoting 16 U.S.C. § 1536(a)(2)). "Before beginning any 'major construction activities,' agencies must prepare a 'biological assessment' to determine whether listed species or critical habitat 'are likely to be adversely affected' by the proposed action." *Id.* (quoting 50 C.F.R. § 402.12). "If so, the action agency must formally consult with the appropriate wildlife agency" — the U.S. Fish and Wildlife Service ("FWS") or, for marine species, the National Marine Fisheries Service — "before undertaking the action." *Id.* (citing 50 C.F.R. § 402.14). "During the formal consultation process, the FWS must 'formulate its biological opinion as to whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat.'" *Id.* (internal brackets omitted) (quoting 50 C.F.R. § 402.14(g)(4)). "If the FWS concludes that jeopardy or adverse modification is likely, then any take resulting from the proposed action is subject to section 9 liability (unless that take is authorized by other provisions of the Act not relevant here)." *Id.* (citing cases). "If, on the other hand, the FWS concludes in its biological opinion that no jeopardy or adverse modification is likely, but that the project is likely to result only in the 'incidental take' of members of listed species, then the FWS will provide, along with its biological opinion, an incidental take statement authorizing such takings." *Id.* (emphasis removed) (citing 50 C.F.R. § 402.14(i)). "'Significantly, the Incidental Take Statement functions as a safe harbor provision immunizing persons from Section 9 liability and penalties for takings committed during activities that are otherwise lawful and in compliance with its terms and conditions.'" *Id.* at 1108 (quoting *Ariz. Cattle Growers' Ass'n v. U.S. Fish and Wildlife*, 273 F.3d 1229, 1239 (9th Cir. 2001)); *see also Defenders of Wildlife*, 2016 WL 4382604, at *2 ("In addition, where the agency's action involves authorization or approval of private party conduct, then the private party is also protected from Section 9 by compliance with the agency's incidental take statement.").

"The action agency must . . . reinitiate consultation if the proposed action 'is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion.'" *Ctr. for Biological Diversity*, 698 F.3d at 1108 (quoting 50 C.F.R. § 402.16(c)). "When reinitiation of consultation is required, the original biological opinion loses its validity, as does its accompanying incidental take statement, which then no longer shields the action agency from penalties for takings." *Id.* (citing *Allen*, 476 F.3d at 1037; U.S. Fish and Wildlife Serv & Nat'l Marine Fisheries Serv., *Endangered Species Consultation Handbook: Procedures for Conducting Consultation and Conference Activities under Section 7 of the Endangered Species Act* 4–23 (1998)).

"For projects that do not require authorization or funding from a federal agency, Section 10 allows a private party to seek an incidental take permit directly from FWS." *Defenders of Wildlife*, 2016 WL 4382604, at *2 (citing 16 U.S.C. § 1539(a)(1)(B)). "To receive a Section 10 permit, the applicant must submit a comprehensive conservation plan that provides for mitigation efforts that minimize the project's future impact on listed species." *Id.* (citing 50 C.F.R. § 17.22(b)(1)(iii)). "FWS may issue the permit only after affording the opportunity for public comment on the conservation plan." *Id.* (citing 50 C.F.R. § 17.22).

"If take is not permitted pursuant to Section 10 or a Section 7 consultation, a developer who undertakes activities that result in the take of listed species may be subject to criminal and civil federal enforcement actions, as well as civil citizen suits." *Id.* (citing 16 U.S.C. § 1540).

## 2. The Subgrant Applications

FEMA ultimately approved the University's two subgrant applications to perform fire-mitigation work in Claremont Canyon and Strawberry Canyon and also approved two other subgrant applications: one by the City of Oakland and one by the East Bay Regional Park District. The four subgrant applications are as follows.

## 2.1 The University's Subgrant Applications

The University owns approximately 800 acres of land in the East Bay Hills, known as the "Hill Campus."[22] Cal Fire has prepared fire-hazard-severity mapping that indicates that most of the undeveloped areas in the East Bay Hills are in the "very high fire hazard severity zone," which is the zone where wildfire hazards are most severe.[23] Between 1923 and 1992, fifteen major wildfires occurred in the East Bay Hills, including the 1991 Tunnel Fire, which killed 25 people, destroyed more than 3,000 homes, and caused an estimated $1.5 billion in damage.[24]

In February 2005, the University submitted two subgrant applications to Cal OES for Pre-Disaster Mitigation grant funding: one for Claremont Canyon[25] and one for Strawberry Canyon.[26] The University set forth its scope of work in its applications:

> In the project location, the understory is a rich assembly of native tree and shrub species growing beneath a canopy overwhelmingly comprised of resprouted eucalyptus trees. The eucalyptus reproduces rapidly from nuts and resprouts, increasing the fuel load and density. Additionally, a small percentage of the canopy assemblage comprises exotic acacia species, which also spread rapidly and produce flammable litter. [Monterey Pine, another fire prone exotic tree, is also present in the project area and will be removed in favor of the native, firesafe, trees.[27]] The management strategy promotes a forest conversion: the emerging native forest of California Bay, Oak, Maple, Buckeye, Redwood and Hazelnut will be retained and the existing eucalyptus-dominated exotic canopy forest will be eradicated. The native species produce either considerably lesser fuel loads or are most fuel-productive well before the peak of the regional fire season. During the project, the native understory will be protected, while the exotic trees will be removed and their stump cambium chemically treated with herbicide to prevent re-sprouting. Felled eucalyptus[, pine[28]] and acacia will be either removed — most will then be chipped — or lopped and scattered or chipped and scattered on the project site. Logs will be

---

[22] McGarrahan Decl. – ECF No. 121 at 2 (¶ 4).

[23] Final EIS – AR 10.1-015 at 11 (p. 2-1).

[24] *Id.* at 12 (p. 2-2).

[25] Regents of the Univ. of Cal., Subgrant Project Application, *University of California Fire Mitigation Project – Claremont Canyon* (Feb. 24, 2005) ("Claremont Canyon Application") – AR 1.2.1-010.

[26] Regents of the Univ. of Cal., Subgrant Project Application, *University of California Fire Mitigation Project – Strawberry Canyon* (Feb. 24, 2005) ("Strawberry Canyon Application") – AR 1.2.1-011.

[27] This appears only in the Strawberry Canyon Application, not the Claremont Canyon Application.

[28] This appears only in the Strawberry Canyon Application, not the Claremont Canyon Application.

placed and retained as a component of the sediment/erosion control measures to be employed and will serve as habitat supporting a variety of wildlife. Protection of the native species, and ongoing management after project completion, will ensure a successful conversion protective of natural and recreational resource values, including but not limited to habitat, hydrology, soils and geology, and air quality. All cut tree stumps shall receive annual follow-up treatment of herbicides (Garlon 4, Stalker) on any emerging stump sprouts, to ensure the permanent elimination of eucalyptus from the project area. Follow up treatment of resprouts will be conducted until 100% resprout suppression is obtained. Additionally, eucalyptus seedlings emerging from the latent seed stock present in the project area will be managed over time to prevent re-colonization of this invasive species. The project duration is anticipated to be [18 – 24 months[29]] [24 – 36 months[30]], with [12 to 24 weeks[31]] [20 to 30 weeks[32]] of actual vegetation removal work. Follow-up treatment will occur at least quarterly, and will be conducted as an ongoing maintenance operation beyond the scope of the proposed grant. Follow-up efforts required for successful eradication of all eucalyptus resprouts and seedlings are anticipated to be 7 to 10 years.

. . . .

The outcome of the project will be the complete removal and permanent eradication of the invasive Bluegum Eucalyptus trees, currently numbering over [400[33]] [280[34]] per acre. These tall, fast growing, invasive, fire-prone trees represent a substantial hazard and extreme fuel load on this interface wildland. The trees will be cut using conventional forestry technologies, and the resulting biomass will be chipped and scattered, recycled, or retained as habitat. The trees will be initially treated with herbicide, then retreated semi-annually until 100% eradication is completed. The non-target trees will be saved and will be encouraged to continue to thrive in the project area, resulting in a much safer and stable vegetation type.[35]

The University also explained why it viewed its project was the best alternative:

The eradication of the eucalyptus forest — as a goal — is the best method to cost-effectively control the vegetation management problem. Previous efforts have targeted the eucalyptus for removal, but had not eradicated the plant, so the trees

---

[29] This appears in the Claremont Canyon Application.

[30] This appears in the Strawberry Canyon Application.

[31] This appears in the Claremont Canyon Application.

[32] This appears in the Strawberry Canyon Application.

[33] This appears in the Claremont Canyon Application.

[34] This appears in the Strawberry Canyon Application.

[35] Claremont Canyon Application – AR 1.2.1-010 at 7, 20; Strawberry Canyon Application – AR 1.2.1-011 at 7, 20.

grew back rapidly — up to 15 feet per year! The plan to allow the native plant species to succeed the invasive eucalyptus is thought to promote a sustainable, cost-effective approach, that has won broad acceptance from the community, including environmental activists and native plant societies.[36]

The University addressed how its project would comply with federal laws and executive orders and complement other federal programs:

The work is complementary to efforts of the US Fish and Wildlife Service in its mission to protect the endangered Alameda Whipsnake. Through this project, the potential habitat for this endangered snake will be increased, and the slow destruction of it [sic] remaining habitat, by continual eucalyptus colonization, is effectively halted. The USF&W is supporting similar projects on other nearby lands, having recognize the value of this approach to the recovery of endangered species.[37]

## 2.2   The City of Oakland's and the East Bay Regional Park District's Subgrant Applications

The City of Oakland also submitted a subgrant application to Cal OES for Pre-Disaster Mitigation grant funding.[38] Oakland explained that its proposed project "is a collaboration between the City of Oakland, UC Berkeley, and East Bay Regional Park District[.]"[39] Like the University, Oakland set forth its statement of work as one where "the existing eucalyptus-dominated exotic canopy forest will be eradicated" and the understory of native trees would be preserved.[40]

---

[36] Claremont Canyon Application – AR 1.2.1-010 at 8; Strawberry Canyon Application – AR 1.2.1-011 at 8. The Strawberry Canyon application included as additional comments that "Management now understands and appreciates that the erradication [sic] must be completed, so that this expense need not be felt again in a generation. Recent projects are showing great success in this area, primarily through constant, aggressive retreatment. If we erradicate [sic] the eucalyptus, the resulting native plants will provide a slower growing, more firesafe alternative, which whose [sic] benefit will accrue far beyond the stated 15 life cycle of the project." Strawberry Canyon Application – AR 1.2.1-011 at 8.

[37] Claremont Canyon Application – AR 1.2.1-010 at 21; Strawberry Canyon Application – AR 1.2.1-011 at 21.

[38] Oakland Fire Dep't, Subgrant Project Application, *Oakland Regional Fuel Management Project* (2005) ("Oakland Application") – AR 1.2.1-014.

[39] *Id.* at 5.

[40] *Id.* at 7, 20.

The East Bay Regional Park District submitted a separate subgrant application to Cal OES for Hazard Mitigation Grant Program grant funding.[41] The Park District said that it "would reduce fuel loads primarily by promoting conversion of dense scrub, eucalyptus forest, and non-native pine forest to grassland with islands of shrubs. Oak and bay trees would be preserved."[42]

### 3. FEMA's Review of the Subgrant Applications

FEMA's involvement in the hazardous-fire-risk-reduction projects triggered NEPA requirements.[43] In January 2008, FEMA published a notice of availability for a draft Environmental Assessment on the Strawberry Canyon project area for public comment.[44] The public-involvement process revealed concerns regarding the effectiveness and scope of the proposed vegetation-removal methods, the proposed application of wood chips in portions of the project area, impacts to plant and animal species in the area, and potential cumulative impacts of all projects in the project area.[45] Based on the findings of that Environmental Assessment, and after consulting with the U.S. Department of Homeland Security, the Council on Environmental Quality, Cal OES, and the subapplicants, FEMA decided to prepare an Environmental Impact Statement to address the potential environmental impacts of the projects proposed in the University's, Oakland's, and the Park District's subgrant applications.[46]

On June 10, 2010, FEMA published in the Federal Register a notice of intent to prepare an Environmental Impact Statement. *Hazardous Fire Risk Reduction, East Bay Hills, CA*, 75 Fed. Reg. 32,960 (June 10, 2010).[47] The notice of intent initiated a public scoping period that

---

[41] Hazard Mitigation Grant Program, *East Bay Regional Park District Brushing Fuels Management* (revised May 3, 2013) – AR 1.2.2-002 ("Park District Application").

[42] *Id.* at 18.

[43] Final EIS – AR 10.1-010 at 5 (p. ES-5).

[44] *Id.* at 6 (p. ES-6).

[45] *Id.*

[46] *Id.*

[47] *Id.*

concluded on October 1, 2010.[48] FEMA conducted two public scoping meetings in August 2010 to solicit input from the public about the environmental topics to be included in the Environmental Impact Statement and the issues to be analyzed in depth.[49]

On June 11, 2010 and October 15, 2010, FEMA sent participation letters to the U.S. Fish and Wildlife Service and the National Oceanic and Atmospheric Administration Fisheries Services, respectively, to notify them that it would be developing a biological assessment in accordance with the Endangered Species Act to determine whether the proposed action might adversely affect Endangered-Species-Act-listed species and/or their critical habitat.[50] On September 5, 2012, FEMA transmitted its biological assessment to the Fish and Wildlife Service and the Fisheries Service, initiating formal consultation under Section 7(a)(2) of the Endangered Species Act on the proposed hazardous-fire-risk-reduction methods in the proposed and connected project areas.[51]

On May 3, 2013, FEMA published in the Federal Register a notice of availability of a draft Environmental Impact Statement. *Environmental Impact Statements; Notices of Availability*, 78 Fed. Reg. 26,027 (May 3, 2013).[52]

On May 10, 2013, the Fish and Wildlife Service issued a Biological Opinion for the project.[53] The Opinion described the project as one where "[t]he native understory would be protected while exotic trees would be removed and the cambium and stumps of eucalyptus (*Eucalyptus* species) and acacia (*Acacia* species) would be mechanically or chemically treated with herbicide to prevent re-sprouting" and one where the University "would be conducting selective eradication of exotic

---

[48] *Id.*

[49] *Id.*

[50] *Id.* – AR 10.1-015 at 618 (p. 7-6).

[51] *Id.*

[52] *Id.* – AR 10.1-010 at 6 (p. ES-6).

[53] Sacramento Fish and Wildlife Office, U.S. Dep't of the Interior, *Biological Opinion for the Proposed Federal Emergency Management Agency (FEMA) Hazardous Fire Risk Reduction Project in the East Bay Hills of Alameda and Contra Costa Counties, California (HMGP 1731-16-34, PDM-PJ-09-CA-2005-003, PDM-PJ-09-CA-2005-011, and PDM-PJ-09-CA-2006-004)* (May 10, 2013) ("Biological Opinion") – AR 10.1-014 at 9–206.

species (e.g., eucalyptus, Monterey pine, and acacia)[.]"[54] The Opinion addressed the potential effects of the project on three species listed as threatened under the Endangered Species Act — the California red-legged frog (*Rana draytonii*), the Alameda whipsnake (*Masticophis lateralis euryxanthus*), and the pallid manzanita (*Arctostaphylos pallida*) — and the designated critical habitat of one of the three species (the Alameda whipsnake).[55] With respect to the University, the Opinion found that its Claremont Canyon and Strawberry Canyon project would have short-term and temporary adverse effects on, but long-term benefits for, the California red-legged frog and the Alameda whipsnake and their habitats.[56]

With respect to the California red-legged frog, the Opinion found that the University's project would temporarily displace or possibly injure or kill frogs and have a temporary adverse effect on suitable frog habitat within the action area during work activities.[57] The Opinion also found that the University's project would ultimately provide benefits because removal of eucalyptus and conversion to native plant species would benefit the frog by improving water quality (by removing eucalyptus, which is a source of phytochemicals that impair water quality) and by increasing the amount of time that aquatic habitats within the project area would remain wet.[58]

With respect to the Alameda whipsnake, the Opinion noted that the University's initial treatment activities "would be limited to areas unsuitable for Alameda whipsnakes such as eucalyptus and other non-native forests. Therefore, no suitable Alameda whipsnake habitat would be disturbed during UCB's initial treatment activities."[59] The Opinion found that the University's

---

[54] *Id.* at 13, 15 (pp. 5, 7); *see also id.* at 16 (p. 8) (discussing "[f]ollow-up efforts required for successful eradication of all eucalyptus re-sprouts and seedlings"), 133 (p. 125) (discussing how the project would result in "[t]he complete removal of eucalyptus and other non-native trees on UCB and Oakland parcels").

[55] *Id.* at 9 (p. 1).

[56] *Id.* at 96–99, 103 (pp. 88–91, 95) (re California red-legged frog), 106–08, 122, 125 (pp. 98–100, 114, 117) (re Alameda whipsnake). The Opinion examined the pallid manzanita only in connection with the Park District's project, not the University's or Oakland's. *Id.* at 133–35 (pp. 125–27).

[57] *Id.* at 96 (p. 88).

[58] *Id.* at 99, 103 (pp. 91, 95).

[59] *Id.* at 122 (p. 114).

project might temporarily displace or possibly injure or kill whipsnakes living in habitats adjacent to the University's project sites.[60] The Opinion also found that the University's project would ultimately provide benefits because eucalyptus and other non-native forests are unsuitable for the whipsnake and the University's eradicating non-native trees would create new habitat areas for the whipsnake, including 32.9 acres of non-native forests that would be converted into "core scrub habitat" for the whipsnake.[61] By contrast, the Opinion found that the Park District's project to thin the eucalyptus forest would not significantly increase the whipsnake's core scrub habitat because 50% of the eucalyptus canopy cover would still be retained.[62] The Opinion found that the Park District's project to thin shrubs also would result in the permanent loss of core scrub habitat for the whipsnake.[63]

The Opinion concluded that the project was not likely to jeopardize the continued existence of the California red-legged frog and the Alameda whipsnake in part because the University's removal of non-native trees would expand and improve the species' habitats.[64]

The Opinion included an incidental-take statement that permitted limited harassment, injury, mortality, and capture of California red-legged frogs and Alameda whipsnakes in the Claremont Canyon and Strawberry Canyon project areas.[65] The Opinion recommended that, among other things, "FEMA, UCB [University of California Berkeley], and EBRPD [East Bay Regional Park District] should promote the eradication of non-native eucalyptus, Monterey pine, Monterey cypress, and French broom within and near suitable habitat for the Alameda whipsnake and the Presidio clarkia."[66] The Fish and Wildlife Service said that the Opinion concluded its formal

---

[60] *Id.*

[61] *Id.* at 122, 125 (pp. 114, 117).

[62] *Id.* at 125 (p. 117).

[63] *Id.* at 123 (p. 115). The Opinion noted that the Park District proposed compensating for this loss by preserving in perpetuity another region of core scrub habitat for the whipsnake. *Id.*

[64] *Id.* at 136–37 (pp. 128–29).

[65] *Id.* at 138–141 (pp. 130–33).

[66] *Id.* at 143 (p. 135).

consultation with FEMA but noted that reinitiation of formal consultation would be required if, among other things, "the agency action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in this biological opinion."[67]

FEMA held three public meetings near the project area and received over 13,000 comments on its draft Environmental Impact Statement.[68] After review and consideration of the comments, FEMA completed a Final Environmental Impact Statement. On December 5, 2014, FEMA published in the Federal Register a notice of availability of the Final Environmental Impact Statement. *Environmental Impact Statements; Notice of Availability*, 79 Fed. Reg. 72,172 (Dec. 5, 2014).

Among other things, in response to a number of public comments on the draft Environmental Impact Statement, FEMA, in coordination with the University and the other subapplicants, modified the proposed vegetation management for several project areas in the University's and Oakland's subapplications to implement a "unified methodology" more consistent with the Park District's approach of selective removal and thinning of trees in some areas.[69] With respect to the University's subapplications, the "unified methodology" would be applied to a 9.7-acre subarea of the 42.8-acre Claremont Canyon project area and three subareas totaling 12.4 acres of the 56.3-acre Strawberry Canyon project area.[70] In these areas, under the "unified methodology," there would be a greater emphasis on "thinning" rather than "complete removal" in order to achieve the fire-risk-reduction goals.[71] In the Claremont Canyon project area, the focus would be to remove tall trees, especially near the ridge top, reducing the volume of dead fuel on the ground and in tree canopies.[72] In thinned locations, understory vegetation and woody material would be removed,

---

[67] *Id.* at 144–45 (pp. 136–37).

[68] Final EIS – AR 10.1-010 at 6 (p. ES-6).

[69] *Id.* at 10–11 (pp. ES-10 to -11); Final EIS – AR 10.1.015 at 38 (p. 3-24).

[70] Final EIS – AR 10.1-015 at 37–39 (pp. 3-23 to -25).

[71] *Id.* at 37 (p. 3-23).

[72] *Id.* at 39 (p. 3-25).

and the remaining trees would be limbed to a minimum height of ten feet.[73] In the Strawberry Canyon project area, instead of complete removal of all eucalyptus trees within the first two years, the focus would be to reduce fire fuels within 100 feet of structures.[74] In these subareas, the lower branches of all trees would be limbed to a minimum height of eight feet, and the understory vegetation would be removed.[75] Shrubs would be thinned to a minimum spacing of six feet.[76] Eucalyptus trees would remain, at an average spacing of 35 feet, with a clear understory.[77] Tall trees prone to torching would be removed, and no understory would remain near trees that were retained.[78]

The Final Environmental Impact Statement reported that:

> Based on the wildfire hazard characteristics of the East Bay Hills and the Miller/Knox Regional Shoreline, FEMA concluded that a need exists to reduce hazardous fire risk to people and structures in these areas. FEMA proposes to address this need by providing financial assistance to the subapplicants through the PDM and HMGP programs for long-term, cost-effective fuel reduction measures to reduce risk of loss of life and damage to vulnerable structures from wildfire.[79]

On February 26, 2015, FEMA issued a 26-page Record of Decision documenting its review process and its decision to fund the University's subgrant applications, Oakland's subgrant application in part, and the Park District's subgrant application.[80]

---

[73] *Id.*

[74] *Id.* at 38 (p. 3-24).

[75] *Id.*

[76] *Id.*

[77] *Id.*

[78] *Id.*

[79] Final EIS – AR 10.1-010 at 7 (p. ES-7).

[80] FEMA, Dep't of Homeland Sec., *Hazardous Fire Risk Reduction Record of Decision[:] East Bay Hills, California* (Feb. 2015) – AR 13.1-002. FEMA declined to fund Oakland's application with respect to one parcel, Frowning Ridge, managed by the University, because the University had engaged in fuel-reduction measures (including removing approximately 600 trees) before FEMA issued its final Environmental Impact Statement. *Id.* at 5–6 (pp. 1–2).

On March 27, 2015, FEMA sent letters to Cal OES notifying Cal OES that it was approving

$291,000 in grant funding for the University's Claremont Canyon project,[81] $282,828 in grant

funding for the University's Strawberry Canyon project,[82] $3,000,000 in grant funding for

Oakland's project,[83] and $2,268,908 in grant funding for the Park District's project.[84] Each letter

stated in part that:

> Any change to the approved statement of work (SOW) requires prior approval
> from FEMA. The National Environmental Policy Act (NEPA) stipulates that
> additions or amendments to the SOW shall be reviewed by all state and federal
> agencies participating in the NEPA process. NEPA sign-off for all SOW additions
> or amendments is required before the revised SOW can be approved by FEMA or
> implemented by the [] Subgrantee.

> We will work closely with you and your staff to ensure the success of the
> project. FEMA's goal is for all approved projects to begin immediately and to be
> completed within the timeframes specified in the project sub-application. Please be
> aware that this project and future projects may be disallowed for non-performance,
> or for violation of any federal, state, or local environmental law or regulation.[85]

On April 3, 2015, Cal OES sent letters to the University, Oakland, and the Park District

notifying them of the approvals.[86]

---

[81] Letter from Jeffrey D. Lusk, Director, Mitigation Division, FEMA Region IX, to Mark Ghilarducci, Director, Cal. Governor's Office of Emergency Servs. (Mar. 27, 2015) ("Claremont Canyon Approval Letter") – AR 1.2.1-016.

[82] Letter from Jeffrey D. Lusk, Director, Mitigation Division, FEMA Region IX, to Mark Ghilarducci, Director, Cal. Governor's Office of Emergency Servs. (Mar. 27, 2015) ("Strawberry Canyon Approval Letter") – AR 1.2.1-017.

[83] Letter from Jeffrey D. Lusk, Director, Mitigation Division, FEMA Region IX, to Mark Ghilarducci, Director, Cal. Governor's Office of Emergency Servs. (Mar. 27, 2015) ("Oakland Approval Letter") – AR 1.2.1-018.

[84] Letter from Jeffrey D. Lusk, Director, Mitigation Division, FEMA Region IX, to Mark Ghilarducci, Director, Cal. Governor's Office of Emergency Servs. (Mar. 27, 2015) ("Park District Approval Letter") – AR 17.1.1-004.

[85] Claremont Canyon Acceptance Letter – AR 1.2.1-016 at 2; Strawberry Canyon Acceptance Letter – AR 1.2.1-017 at 2; Oakland Acceptance Letter – AR 1.2.1-016 at 2; Park District Acceptance Letter – AR 17.1.1-004 at 2.

[86] Letter from Nancy Ward, Chief Deputy Director, Cal. Governor's Office of Emergency Servs., to Jyl Baldwin, Assoc. Director, Univ. of Cal., Berkeley (Apr. 3, 2015) – AR 17.1.1-014; Letter from Nancy Ward, Chief Deputy Director, Cal. Governor's Office of Emergency Servs., to Jyl Baldwin, Assoc. Director, Univ. of Cal., Berkeley (Apr. 3, 2015) – AR 17.1.1-013; Letter from Nancy Ward, Chief Deputy Director, Cal. Governor's Office of Emergency Servs., to Teresa Deloach Reed, Fire

### 4. Challenges to the University's Project

Two sets of plaintiffs — (1) a non-profit organization called the Hills Conservation Network and (2) a non-profit organization called SPRAWLDEF (Sustainability, Parks, Recycling and Wildlife Legal Defense Fund), together with the environmental organization the Sierra Club[87] — filed suits to block the University's Claremont Canyon and Strawberry Canyon project (among other projects) from going forward. Broadly speaking, SPRAWLDEF argued in favor of the University's original plan of non-native-tree eradication and overstory removal, whereas HCN argued in favor of changing the entire plan to one focusing on selective thinning and understory removal. Both SPRAWLDEF and HCN objected to FEMA's change to a "unified methodology" approach — SPRAWLDEF because the "unified methodology" change went too far, and HCN because it did not go far enough.

### 4.1   The *Federal HCN* and *SPRAWLDEF* Lawsuits

#### 4.1.1   Filing the lawsuits

On March 6, 2015, HCN sued (1) FEMA and its acting regional administrator, (2) the director of Cal OES, (3) the University, (4) Oakland, and (5) the Park District.[88] The case was assigned to this court. HCN opposed the University's and Oakland's plan to eradicate non-native tree species and instead favored an alternative to "apply selective thinning" to the project area, removing underbrush and lower limbs of trees but otherwise leaving large trees (including non-native eucalyptus trees) in place.[89] HCN alleged that FEMA (1) violated NEPA and the APA by failing to adequately respond to HCN and its alternative proposals and (2) additionally violated NEPA and the APA by changing a portion of the project from the University's and Oakland's original

---

Chief, City of Oakland (Apr. 3, 2015) – AR 17.1.1-012; Letter from Nancy Ward, Chief Deputy Director, Cal. Governor's Office of Emergency Servs., to Robert E. Doyle, Gen. Manager, East Bay Reg'l Park Dist. (Apr. 3, 2015) – AR 1.2.2-001.

[87] For convenience, the court refers to SPRAWLDEF and the Sierra Club collectively as "SPRAWLDEF."

[88] Complaint, *Hills Conservation Network v. FEMA*, No. 3:15-cv-01057-LB (N.D. Cal. Mar. 6, 2015), ECF No. 1.

[89] *Id.* at 2–3 (¶¶ 2–3).

proposal to eradicate non-native tree species to the "unified methodology" without circulating that change to the project as a supplemental Environmental Impact Statement.[90] HCN asked the court to enjoin FEMA's issuance of any funds for the projects and to enjoin any ground-disturbing activities by the subapplicants (including the University) that would be funded by FEMA's grant.[91]

On May 26, 2015, SPRAWLDEF sued FEMA and its acting regional administrator.[92] The case was assigned to this court as related to the *Federal HCN* lawsuit. On August 20, 2015, SPRAWLDEF filed an amended complaint adding the University, Oakland, and the Park District as additional defendants.[93] SPRAWLDEF alleged that FEMA violated NEPA and the APA by changing a portion of the project from the University's and Oakland's original proposal to eradicate non-native tree species to the "unified methodology."[94] In contrast to HCN, which advocated in favor of thinning and against wholesale eradication of non-native trees, SPRAWLDEF emphasized that the Fish and Wildlife Service's Biological Opinion required eucalyptus and pine removal (as opposed to merely thinning) to foster native scrub species with more manageable fire behavior and fuel characteristics and to promote the habitat of the Alameda whipsnake.[95] SPRAWLDEF asked the court to declare FEMA's Record of Decision and its Final Environmental Impact Statement to be violations of NEPA and to enjoin FEMA's grant funding until the Environmental Impact Statement was corrected.[96]

---

[90] *Id.* at 3–4 (¶¶ 3–4).

[91] *Id.* at 4 (¶ 5).

[92] Complaint, *SPRAWLDEF v. FEMA*, No. 3:15-cv-02331-LB (N.D. Cal. May 26, 2015), ECF No. 1.

[93] First Amend. Compl., *SPRAWLDEF v. FEMA*, No. 3:15-cv-02331-LB (N.D. Cal. Aug. 20, 2015), ECF No. 29.

[94] *Id.* at 2 (¶¶ 7–9).

[95] *Id.* at 9 (¶¶ 48–51).

[96] *Id.* at 14 (Prayer for Relief ¶ 1).

### 4.1.2    Moving for summary judgment

On March 1, 2016, HCN moved for summary judgment in the *Federal HCN* lawsuit. Among

other things, HCN argued that FEMA's Environmental Impact Statement analyzed only two

alternatives — the proposed project and the alternative of no action — without analyzing HCN's

selective-thinning proposal.[97] HCN argued that the fact that FEMA adopted the "unified

methodology" for a portion of the project showed that selective thinning was feasible and argued

that FEMA's change was insufficient because the "unified methodology" begins with thinning but

then follows up with eradication of non-native trees four to five years later, and hence the

eradication is only delayed, not prevented.[98]

On April 18, 2016, the *Federal HCN* defendants (including the University) opposed HCN's

motion and cross-moved for summary judgment. Among other things, the University argued that:

> [HCN]'s demand for across-the-board adoption of selective thinning ignores the
> greater erosion impacts that would result from implementing that method in heavily
> sloped areas. FEMA reasonably concluded that overstory removal was the
> appropriate methodology to apply where severe slope and other accessibility
> limitations would prevent the greater levels of long-term maintenance required by
> the selective thinning approach.
>
> . . . .
>
> "UC's land is not configured or improved to facilitate labor-intensive ground
> fuel removal, and any such efforts would be expensive, dangerous to workers and
> disruptive to faunal habitats, particularly those of the Alameda Whipsnake."[99]

On March 28, 2016, SPRAWLDEF moved for summary judgment in the *SPRAWLDEF*

lawsuit. Among other things, SPRAWLDEF argued that "[a] Biological Opinion produced by the

U.S. Fish & Wildlife Service makes clear that removal of the eucalyptus overstory and native

---

[97] Plaintiff's Notice of Motion and Motion for Summary Judgment; Memorandum of Points and Authority in Support Thereof, *Hills Conservation Network v. FEMA*, No. 3:15-cv-01057-LB (N.D. Cal. Mar. 1, 2016), ECF No. 69 at 15–21.

[98] *Id.* at 21–22.

[99] Regents of the University of California's Notice of Cross-Motion, Cross-Motion for Summary Judgment and Opposition to Plaintiff Hills Conservation Network's Motion for Summary Judgment, *Hills Conservation Network v. FEMA*, No. 3:15-cv-01057-LB (N.D. Cal. Apr. 18, 2016), ECF No. 80 at 9–11 (citations omitted).

United States District Court
Northern District of California

species restoration is required not only to prevent long-term fire hazard and save public funds, but also to compensate for habitat impacts to several endangered species by restoring their native environment."[100] It also argued that FEMA's adoption of "the vague 'unified methodology' that appears to adopt thinning instead of native restoration in arbitrarily selected location" increased fire risk and harm to endangered species.[101] It argued that the Biological Opinion stated that "'the [U.S. Fish and Wildlife] Service does not believe that any suitable Alameda whipsnake habitat will be created where eucalyptus forest is only thinned.'"[102]

On April 18, 2016, the *SPRAWLDEF* defendants (including the University) opposed SPRAWLDEF's motion and cross-moved for summary judgment. Among other things, the University argued that even under the "unified methodology," it "remain[ed] obligated to create significant amounts of suitable habitat for the Alameda whipsnake: 167.9 acres, including 32.9 acres of core scrub habitat."[103] In its reply, SPRAWLDEF continued to object to the "unified methodology," arguing that "FEMA arbitrarily and unreasonably required eucalyptus 'thinning' in the four critical UCB-Oakland subareas only to placate HCN. Never satisfied, HCN now wants FEMA to apply the useless thinning projectwide. This was not a 'technical decision' of FEMA's 'experts.' It is not 'risk balancing and scientific judgment.'"[104] Among other things, SPRAWLDEF argued that the "unified methodology" thinning approach was inconsistent with the Biological Opinion, which "was predicated completely upon the overstory removal so that the native understory, and its habitat, could be restored."[105] SPRAWLDEF noted that FEMA, in its

---

[100] Plaintiffs SPRAWLDEF and Sierra Club Memorandum of Points & Authorities in Support of Summary Judgment, *SPRAWLDEF v. FEMA*, No. 3:15-cv-02331 (N.D. Cal. Mar. 28, 2016), ECF No. 64 at 4.

[101] *Id.*

[102] *Id.* at 10 (quoting Biological Opinion – AR 10.1-014 at 124 (p. 116) and citing Biological Opinion – AR 10.1-014 at 133 (p. 125)).

[103] Regents of the University of California's Notice of Cross-Motion, Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment, *SPRAWLDEF v. FEMA*, No. 3:15-cv-02331-LB (N.D. Cal. Apr. 18, 2016), ECF No. 73 at 12 (citations omitted).

[104] Plaintiffs SPRAWLDEF/Sierra Club Reply/Opposition to Summary Judgment Motions, *SPRAWLDEF v. FEMA*, No. 3:15-cv-02331-LB (N.D. Cal. May 16, 2016), ECF No. 74 at 4 & n.1.

[105] *Id.* at 10.

opposition to HCN's motion for summary judgment, argued that "[o]nly *complete overstory removal* results in the creation of habitat for the whipsnake."[106]

### 4.1.3 Settling the *Federal HCN* lawsuit and terminating the grants for the University's Claremont Canyon and Strawberry Canyon project

On July 19, 2016, FEMA and Cal OES met with representatives of the University and advised that FEMA was considering terminating the grants with respect to the University's Claremont Canyon and Strawberry Canyon project.[107]

On August 1, 2016, FEMA, joined by HCN and the director of Cal OES, moved to vacate the summary-judgment hearing in the *Federal HCN* lawsuit because "HCN, FEMA, and Cal OES have been engaged in productive settlement negotiations that will fully resolve the claims in this litigation and lead to dismissal of the case."[108]

On August 8, 2016, HCN, FEMA, and Cal OES filed a joint reply clarifying that they had reached a settlement framework whereby FEMA would terminate the grants for the University's and Oakland's projects.[109] HCN had agreed to the settlement, Cal OES was recommending it, and FEMA staff was recommending it to its senior management and to the Department of Justice.[110]

---

[106] *Id.* (emphasis added by SPRAWLDEF) (quoting Federal Defendants' Notice of Cross-Motion; Cross-Motion for Summary Judgment; and Brief in Support of Cross-Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment, *Hills Conservation Network v. FEMA*, No. 3:15-cv-01057-LB (N.D. Cal. Apr. 18, 2016), ECF No. 78 at 24–25).

[107] McGarrahan Decl. – ECF No. 121 at 5 (¶ 26).

[108] Joint Motion to Vacate Hearing Date on Cross-Motions for Summary Judgment, *Hills Conservation Network v. FEMA*, No. 3:15-cv-01057-LB (N.D. Cal. Aug. 1, 2016), ECF No. 95 at 2.

[109] Request for Leave to File a Joint Reply; Joint Reply to Motion to Vacate Hearing Date on Cross-Motions for Summary Judgment, *Hills Conservation Network v. FEMA*, No. 3:15-cv-01057-LB (N.D. Cal. Aug. 8, 2016), ECF No. 99 at 2.

[110] *Id.*

By August 23, 2016, HCN, FEMA, Cal OES, and the Park District had drafted a formal settlement agreement,[111] and HCN and Cal OES had signed it.[112] The settlement agreement provided in relevant part that:

> WHEREAS, HCN filed this action ("Action") on March 6, 2015, challenging FEMA's February 2015 "Hazardous Fire Risk Reduction Record of Decision" ("ROD"), the related November 2014 Final Environmental Impact Statement, and the subsequent approval of grant funding for four grants alleging violations of the National Environmental Policy Act ("NEPA"), and FEMA regulations;

> WHEREAS, defendants deny the allegations in the complaint and deny that any violations of NEPA or any other law occurred;

> WHEREAS, the Parties believe it is in the best interest of the public, the Parties; and judicial economy to compromise and settle the issues in this Action;

> NOW, THEREFORE, in consideration of the promises and covenants contained in this Stipulated Settlement Agreement ("Agreement"), the Parties agree to settle all claims and causes of action arising in or related to this Action as follows:

> 1. Termination of Grants:

>> a. Within fourteen (14) days of the effective date of this Agreement, FEMA and Cal OES ("Agencies") will terminate the grants to the University of California ("UCB") (PDMC-PJ-09-CA-2005-003; PDMC-PJ-09-CA-2005-011).

>> b. Within fourteen (14) days of the effective date of this Agreement, the Agencies will terminate the grant to the City of Oakland ("Oakland") (PDMC-PJ-09-CA- 2006-004) except as it applies to the following three East Bay Regional Park District "(Park District") [sic] Projects: Tilden-Grizzly, Sibley Triangle and Island, and Claremont Canyon-Stonewall (the "2006-04 Projects").

>> c. The Parties agree that the grant to the Park District (HMCP #1731-16-34R) will remain in full force and effect.

>> d. As to the part of the Oakland grant related to the Park District's 2006-04 Projects, the Agencies intend to make the Park District the subgrantee as to the funds to be allocated to those 2006-04 Projects. The Parties agree this part of the grant will remain in full force and effect. HCN agrees not to challenge the action to designate the Park District as the subgrantee or the reallocation of funds from the Oakland grant (PDMC-PJ-09-CA-

---

[111] See Stipulated Settlement Agreement, *Hills Conservation Network v. FEMA*, No. 3:15-cv-01057 (N.D. Cal. Sept. 16, 2016), ECF No. 109 ("*Federal HCN* Settlement Agreement") – AR 18.1.1-008.

[112] *Id.* at 6, 8.

2006-004) to the Park District to implement projects from the Park District's Fire Hazard and Resource Management Plan.

2. Withdrawal of Project Decision:

    a. FEMA will withdraw the parts of the February 2015 "Hazardous Fire Risk Reduction Record of Decision" ("ROD") that relate to the UCB and Oakland projects. FEMA intends to issue public notice of its action withdrawing these parts of the ROD.

    b. The Parties agree that the remainder of the ROD will remain in full force and effect.[113]

On August 30, 2016, having heard that FEMA was considering not funding the University's Claremont Canyon or Strawberry Canyon project, a representative of the Fish and Wildlife Service sent an email that copied University representatives to advise that:

If FEMA decides not to fund the UC-Berkeley grants, then there no longer is a Federal nexus under Section 7 of the Endangered Species Act, and the biological opinion and associated incidental take permit for the UC-Berkeley fuels/vegetation management activities are no longer valid. In that case without a Federal nexus, UC-Berkeley would need to receive incidental take coverage through Section 10 of the Endangered Species Act (i.e., through developing a Habitat Conservation Plan (HCP)). UC-Berkeley should not start the fuels/vegetation management activities until they have a valid incidental take permit.[114]

On September 1, 2016, the parties in *Federal HCN* reported to the court that HCN, FEMA, Cal OES, and the Park District had reached agreement on the terms of a settlement and memorialized those terms in a final document and a related request for dismissal.[115] The parties reported that (1) HCN and Cal OES had approved the settlement, (2) Park District staff were recommending approval to the Park District Board and that the Board would decide whether to join the settlement by September 6, (3) FEMA had recommended approval to the Department of Justice and that it expected to have a decision by September 28, and (4) the University opposed the proposal to terminate its grant funding.[116]

---

[113] *Id.* at 2–3.

[114] Email from Terry Joseph, U.S. Fish and Wildlife Serv., to Carol L. Rice, Wildland Res. Mgmt., copying Sally McGarrahan et al., Univ. of Cal. (Aug. 30, 2016 8:19 a.m.) – AR 18.1.1-009 at 1–2.

[115] Joint Case Management Statement, *Hills Conservation Network v. FEMA*, No. 3:15-cv-01057-LB (N.D. Cal. Sept. 1, 2016), ECF No. 102 at 2.

[116] *Id.* at 2–3.

On September 6, 2016, FEMA sent two letters to Cal OES (one relating to the Claremont Canyon subgrant and one relating to the Strawberry Canyon subgrant) stating that:

> This letter is to inform you that the above Pre-Disaster Mitigation (PDM) grant is hereby terminated. This decision is the result of an agreement between FEMA and Cal OES to terminate the grant, pursuant to 2 C.F.R. §200.339(a)(3). As of today's date, no federal action is associated with these projects and therefore the Incidental Take Statement no longer covers the activities proposed for funding by this grant.[117]

On September 7, 2016, Cal OES sent two letters to the University stating that the Claremont Canyon and Strawberry Canyon subgrants had been terminated "based on the agreement between FEMA and Cal OES to terminate the subaward pursuant to 2 C.F.R. 200.339(a)(3)" and enclosing FEMA's termination letters.[118] (Counsel for the University sent two letters to FEMA and Cal OES in response stating that "the purported termination of the PDM grant is invalid and illegal" and that "the University respectfully requests that FEMA and Cal OES withdraw immediately the FEMA letter, and provide written confirmation that the purported termination is null and void."[119])

On September 9, 2016, the Park District signed the settlement agreement.[120] On September 16, 2016, FEMA and its acting regional administrator signed the settlement agreement, and the settlement agreement was final.[121]

---

[117] Letter from Jeffrey D. Lusk, Director, Mitigation Division, FEMA, Region IX, to Mark Ghilarducci, Director, Cal. Office of Emergency Servs. (Sept. 6, 2016) – AR 18.1.1-012; Letter from Jeffrey D. Lusk, Director, Mitigation Division, FEMA, Region IX, to Mark Ghilarducci, Director, Cal. Office of Emergency Servs. (Sept. 6, 2016) – AR 18.1.1-013.

[118] Letter from Mark Ghilarducci, Director, Cal. Office of Emergency Servs., to Jyl Baldwin, Assoc. Director, Univ. of Cal., Berkeley (Sept. 7, 2016) – AR 18.1.1-016; Letter from Mark Ghilarducci, Director, Cal. Office of Emergency Servs., to Jyl Baldwin, Assoc. Director, Univ. of Cal., Berkeley (Sept. 7, 2016) – AR 18.1.1-017.

[119] Letter from Shiraz D. Tangri, Meyers Nave, to Jeffrey D. Lusk, Director, FEMA, Region IX, and Mark. S. Ghilarducci, Director, Cal. Governor's Office of Emergency Servs. (Sept. 16, 2016) – AR 18.1.1-020; Letter from Shiraz D. Tangri, Meyers Nave, to Jeffrey D. Lusk, Director, FEMA, Region IX, and Mark. S. Ghilarducci, Director, Cal. Governor's Office of Emergency Servs. (Sept. 16, 2016) – AR 18.1.1-021.

[120] *Federal HCN* Settlement Agreement – AR 18.1.1-008 at 9.

[121] *Id.* at 7.

On September 20, 2016, FEMA issued a three-page Amended Record of Decision. [122] The Amended Record of Decision stated that:

> FEMA has decided to go forward with only the part of the Proposed Action that authorizes the work under EBRPD [East Bay Regional Park District] grant (HMGP 1731-16-34) and the part of PDM-PJ-09-CA-2006-04 that will be implemented by EBRPD. FEMA is withdrawing the remainder of the decision documented in the February 2015 ROD. The part of the Proposed Action that will proceed under this decision will still reduce hazardous fire risk, the need for future disaster relief, and the risk of repetitive suffering and damage, which meets the purpose and need for the action. . . .
>
> In conjunction with this Amended ROD, the following two grants have been terminated in their entirety:
>
> **PDM-PJ-09-CA-2005-011:** Strawberry Canyon — UCB was the subapplicant for the proposed work in the Strawberry Canyon project area. FEMA, in coordination with Cal OES, has determined that this grant is no longer in the best interest of the government.
>
> **PDM-PJ-09-CA-2005-003:** Claremont Canyon — UCB was the subapplicant for the proposed work in the Claremont Canyon project area. FEMA, in coordination with Cal OES, has determined that this grant is no longer in the best interest of the government. [123]

Also on September 20, 2016, HCN filed a notice of settlement and a request to dismiss the *Federal HCN* lawsuit with prejudice. [124] The court dismissed *Federal HCN* with prejudice on October 17, 2016. [125]

### 4.1.4 Dismissing the *SPRAWLDEF* lawsuit as moot

On September 22, 2016, FEMA and its acting regional administrator and the Park District moved to dismiss the *SPRAWLDEF* lawsuit on the ground that because FEMA had terminated the grants to the University and to Oakland, SPRAWLDEF's challenge to the "unified methodology"

---

[122] FEMA, Dep't of Homeland Sec., *Hazardous Fire Risk Reduction Amended Record of Decision[:] East Bay Hills, California* (Sept. 2016) – AR 18.1.1-022.

[123] *Id.* at 3 (p. 2).

[124] Notice of Settlement; Plaintiff's Request for Dismissal with Prejudice Pursuant to Fed. R. Civ. P. 41(a)(2), *Hills Conservation Network v. FEMA*, No. 3:15-cv-01057-LB (N.D. Cal. Sept. 20, 2016), ECF No. 107.

[125] Order of Dismissal with Prejudice Pursuant to Fed. R. Civ. P. 41(a)(2), *Hills Conservation Network v. FEMA*, No. 3:15-cv-01057-LB (N.D. Cal. Oct. 17, 2016), ECF No. 115.

— which affected only those projects — had been rendered moot.[126] Also on September 22, the University filed a separate motion to dismiss and/or to intervene.[127] The University noted that plaintiffs bear the burden "to demonstrate that a decision in their favor would have some effect" in order for their case to not be moot and argued that SPRAWLDEF had not met this burden in light of FEMA's termination of the University's and Oakland's grants.[128] The University argued in the alternative that if SPRAWLDEF's claims were not dismissed as moot, the University should be entitled to intervene as the real party in interest.[129]

The court held a hearing and dismissed the *SPRAWLDEF* lawsuit as moot, finding that:

> [B]ecause FEMA withdrew the relevant part of the Record of Decision and terminated the grants, the court cannot provide effective relief. It would serve no purpose to require FEMA to go back and analyze site-by-site overstory thinning versus removal (instead of the unified methodology) at sites for which it has revoked the funding. And it is premature to order FEMA do so in any future grant — such an order could have no effect other than requiring FEMA to comply with NEPA, and such potential harm (i.e. caused by FEMA's failure to do so) is too remote. The court therefore could not grant effective relief based on SPRAWLDEF and Sierra Club's unified methodology attacks.
>
> . . . .
>
> SPRAWLDEF and Sierra Club argue that their claim is not moot because the final [Environmental] Impact Statement references the unified methodology. The issue is whether the Impact Statement's discussion of the methodology — despite the amendment to the Record of Decision and the termination of the relevant grants — saves the plaintiffs' claims.
>
> . . . .
>
> . . . . The Impact Statement discussed the unified methodology in the context of its application to the University and Oakland grants. But the withdrawal of those grants renders the Impact Statement's discussion of the methodology an "action" that (1) does not affect the parties' rights and (2) from which legal consequences will not flow. FEMA's final determination — reflected in the Amended Record of

---

[126] Federal Defendants' and East Bay Regional Park District's Notice and Joint Motion to Dismiss; Memorandum in Support of Joint Motion to Dismiss, *SPRAWLDEF v. FEMA*, No. 3:15-cv-02331-LB (N.D. Cal. Sept. 22, 2016), ECF No. 96.

[127] Regents of the University of California's Motion to Dismiss and/or Intervene as Real Party in Interest, *SPRAWLDEF v. FEMA*, No. 3:15-cv-02331-LB (N.D. Cal. Sept. 22, 2016), ECF No. 97.

[128] *Id.* at 6.

[129] *Id.* at 6–7.

Decision and surviving portions of the Impact Statement — does not fund the methodology. And FEMA cannot simply rely on the Impact Statement to implement the methodology in the future: both the [*HCN*] settlement agreement and the amended Record of Decision obligate FEMA to undertake appropriate NEPA review before awarding future grants.

It is thus too late to challenge the previously contemplated use of the methodology — FEMA's final decision terminated the relevant grants. It is also too early to challenge any future use — FEMA must review and take (new) final action regarding future applications before they can be contested. The final Impact Statement's discussion of the unified methodology accordingly has no effect on the plaintiffs' claims . . . .

In sum, to the extent that the plaintiffs' claims challenge the unified methodology, they are moot.

*SPRAWLDEF v. FEMA*, No. 15-cv-02331-LB, 2016 WL 6696046, at *5–7 (N.D. Cal. Nov. 15, 2016). On appeal, the Ninth Circuit affirmed that FEMA's withdrawal of its grants to the University and Oakland mooted SPRAWLDEF's claims. *SPRAWLDEF v. FEMA*, 717 F. App'x 733, 733–34 (9th Cir. 2018).

### 4.2    The *State HCN* Lawsuit

#### 4.2.1    Filing the lawsuit

On June 23, 2016, while the *Federal HCN* and *SPRAWLDEF* lawsuits were pending, the University issued an Action Item pursuant to CEQA approving the "Hill Campus Fire Risk Reduction Work," i.e., the University's Claremont Canyon and Strawberry Canyon project, as memorialized in FEMA's February 2015 Record of Decision.[130] The Action Item stated that the University had reviewed the proposed project in accordance with CEQA and the University's procedures for the implementation of CEQA, as set forth in an addendum to a Long Range Development Plan Environmental Impact Report that it certified in January 2005.[131]

---

[130] Nicholas Dirks, Chancellor, Univ. of Cal., *Action Item[:] Action Under Chancellor's Authority – Action Pursuant to California Environmental Quality Act and Approval of Project[:] Hill Campus Fire Risk Reduction Work, Berkeley Campus* (June 23, 2016) – ECF No. 122 at 33–38.

[131] *Id.* at 33, 36 (pp. 1, 4).

On July 15, 2016, HCN sued the University in California Superior Court in Alameda County.[132] HCN alleged that the University violated CEQA by approving its Hills Campus Fire Risk Reduction Work project without preparing a tiered or supplemental Environmental Impact Report.[133] HCN alleged that the University's approving the project through an addendum to an earlier Environmental Impact Report issued nearly 12 years earlier — instead of preparing a new tiered or supplemental Environmental Impact Report specifically addressing its tree-removal project — violated CEQA and was not supported by substantial evidence.[134] HCN asked the state court to enjoin the University from proceeding with the project until it prepared a tiered or supplemental Environmental Impact Report and performed all other actions necessary to bring it into compliance with CEQA.[135]

### 4.2.2    Enjoining the University

On September 20, 2016, HCN filed an ex parte application for a temporary restraining order and an order to show cause why a preliminary injunction should not issue against the University.[136] HCN sought to enjoin the University from proceeding with its plan to eradicate approximately 47,000 non-native trees:

> HCN seeks an injunction limiting the University's vegetation removal in the project areas to selective thinning of smaller, overly dense, and dying trees. Selective thinning would leave larger trees greater than 6" in diameter at breast height ("DBH") in place, focus on removing litter such as bark and leaves from the base of trees, and limb up trees so that their lower branches are eight feet or more off the ground.
>
>     . . . .

---

[132] Complaint, *Hills Conservation Network, Inc. v. Regents of the Univ. of Cal.*, No. RG16823477 (Cal. Super. Ct. Alameda Cty. July 15, 2016) – ECF No. 123-3 at 5–24.

[133] *Id.* at 5–6 (¶ 2).

[134] *Id.* at 2 (¶¶ 2–5), 12–15 (¶¶ 33–43).

[135] *Id.* at 22 (Prayer for Relief ¶ 3).

[136] Ex Parte Application for a Temporary Restraining Order, Order to Show Cause Regarding Preliminary Injunction, and Stay, *Hills Conservation Network, Inc. v. Regents of the Univ. of Cal.*, No. RG16823477 (Cal. Super. Ct. Alameda Cty. Sept. 20, 2016) – ECF No. 123-3 at 25–45.

HCN also seeks a preliminary injunction prohibiting [the University] from undertaking any activities or engaging in any further conduct implementing the HCFRR in a manner that will preclude UC's consideration of reasonable alternatives to complete tree canopy removal pending entry of judgment in this lawsuit. . . . By preventing the eradication of thousands of trees, the proposed injunction would ensure that fire risk mitigation may occur while not precluding a selective thinning alternative from being considered by UC in an EIR. Nor would that order restrict UC's discretion to select a project alternative after it fully complies with CEQA.[137]

On October 14, 2016, the University opposed HCN's motion.[138] Among other things, the University argued that FEMA's final Environmental Impact Statement was "substantial evidence" supporting the University's decision to proceed with its project through an addendum instead of a subsequent Environmental Impact Report.[139] The University emphasized that FEMA had rejected HCN's "selective thinning" alternative:

In addition, FEMA specifically evaluated the "selective thinning" alternative that HCN demands be implemented as a "one size fits all" solution to managing fire risk. The EIS explained why a methodology which leaves tall eucalyptus and Monterey pine trees in place is ineffective at reducing fire risk due to the phenomenon called "torching or crowning," with eucalyptus firebrands able to start new fires more than half a mile away. FEMA concluded that this alternative did not meet the fire safety purpose and need for the project:

First, a program of only removing brush, debris and small trees does not adequately address the special characteristics of eucalyptus and Monterey pine trees that can make wildfires difficult or even impossible to control. Second, its reliance on continuous removal of ladder fuels under tall trees on steep slopes would likely be prohibitively expensive and increase erosion by disturbing soils.[140]

---

[137] *Id.* at 31–32.

[138] Opposition of the Regents of the University of California to Hills Conservation Network's Application for Preliminary Injunction and Stay, *Hills Conservation Network, Inc. v. Regents of the Univ. of Cal.*, No. RG16823477 (Cal. Super. Ct. Alameda Cty. Oct 14, 2016) – ECF No. 123-3 at 46–70.

[139] *Id.* at 65.

[140] *Id.* at 65–66 (citing and quoting Final EIS – AR 10.1-015 at 16–18 (pp. 3-2 to -4)). Examples of "ladder fuels" are pine needles, shrubs, or an understory layer of trees that can provide fuel contributing to wildfires. *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1296 n.5 (9th Cir. 2003).

The University also argued that HCN's motion for a preliminary injunction should be denied because "[t]he issuance of a preliminary injunction would likely prevent The Regents of the University of California ('University') from commencing that work until September 2017" and "will expose the East Bay Hills to wildfire risk for another year."[141] The University thereby took the position that — despite the fact that FEMA had terminated its grants a month earlier — it was still proceeding with its project that year (absent an injunction preventing it from doing so).

On October 19, 2016, HCN filed a reply in support of its motion.[142] Among other things, it argued that the University could use FEMA's Environmental Impact Statement in place of an Environmental Impact Report under CEQA only if the University had given notice that (1) it was using the federal Environmental Impact Statement in place of an Environmental Impact Report before the Environmental Impact Statement was circulated publicly and (2) it believed the federal Environmental Impact Statement met the requirements of CEQA.[143] HCN argued that the University did not meet these prerequisites and could not belatedly use FEMA's Environmental Impact Statement in place of an Environmental Impact Report under CEQA after the fact.[144]

On October 27, 2016, the state court held a hearing on HCN's motion.[145] Among other things, the state court expressed skepticism that the University could rely on FEMA's Environmental Impact Statement in lieu of an Environmental Impact Report to satisfy CEQA[146] and held that "the

---

[141] Opposition of the Regents of the University of California to Hills Conservation Network's Application for Preliminary Injunction and Stay, *Hills Conservation Network, Inc. v. Regents of the Univ. of Cal.*, No. RG16823477 (Cal. Super. Ct. Alameda Cty. Oct 14, 2016) – ECF No. 123-3 at 51, 68.

[142] Plaintiff's Reply Memorandum of Points and Authorities in Support of Application for Preliminary Injunction and Stay, *Hills Conservation Network, Inc. v. Regents of the Univ. of Cal.*, No. RG16823477 (Cal. Super. Ct. Alameda Cty. Oct. 19, 2016) – ECF No. 123-3 at 71–89.

[143] *Id.* at 85 (citing Cal. Code Regs. tit. 14, § 15225(a)).

[144] *Id.* at 85–86.

[145] Transcript, *Hills Conservation Network, Inc. v. Regents of the Univ. of Cal.*, No. RG16823477 (Cal. Super. Ct. Alameda Cty. Oct. 27, 2016) – ECF No. 123-3 at 90–129.

[146] *Id.* at 115 ("THE COURT: It's a really important[] issue, though[,] in assessing what's required from an entity, of a public entity that's teeing-off of an EIR of a nature or long-range plan. And that's whether or not that initial EIR really did the analysis that would permit a subsequent project that's a little bit more specific in nature. [THE UNIVERSITY]: Agreed, Your Honor. But I think the University is also entitled to rely on subsequent environmental review that has been done by another

fact the University used the addendum process instead of Project EIR or the Supplemental EIR leads me to conclude that there's sufficient likelihood of [HCN's] success for me to issue a preliminary injunction and maintain status quo, and I will do that[.]"[147] The court issued a written order preliminarily restraining and enjoining the University "from taking any action to implement the Hills Campus Fire Risk Reduction Work project, including any road grading, cutting trees 6" in diameter or bigger, vegetation or land clearing or other Project implementation activities that would change the physical environment within the Project Boundaries; . . . [or] issuing any further approvals necessary for implementation of the Project" until final judgment in the *State HCN* lawsuit.[148]

### 4.2.3    Rescinding approval for the University's Claremont Canyon and Strawberry Canyon project

On January 10, 2017, the University's Assistant Vice Chancellor of Physical and Environmental Planning and Campus Architect requested that the University Chancellor rescind the June 2016 Action Item approving the Claremont Canyon and Strawberry Canyon project.[149] The Assistant Vice Chancellor stated as the basis for her request:

> In April 2015, after approximately eight years of consideration and environmental review — an Environmental Impact Statement ("EIS") prepared pursuant to the National Environmental Policy Act ("NEPA") — the U.S. Department of Homeland Security's Federal Emergency Management Agency ("FEMA") awarded grants to UCB to partially cover the cost of implementing the HCFRR [Hill Campus Fire Risk Reduction] Project. FEMA's decision to issue the grants prompted litigation in the United States District Court for the Northern District of California challenging the legal adequacy of the EIS.

---

expert agency, which is the FEMA EIS. And in this situation — THE COURT: There is no authority for that.").

[147] *Id.* at 118–19.

[148] Order Granting Preliminary Injunction, *Hills Conservation Network, Inc. v. Regents of the Univ. of Cal.*, No. RG16823477 (Cal. Super. Ct. Alameda Cty. Oct. 27, 2016) – ECF No. 123-3 at 130–31.

[149] *See* Emily Marthinsen, Assistant Vice Chancellor, Physical and Envtl. Planning and Campus Architect, and Nicholas Dirks, Chancellor, Univ. of Cal., *Rescission of June 2016 Action Item Approving Hill Campus Fire Risk Reduction Work and Associated CEQA Determination* (Feb. 2, 2017) ("Rescission") – ECF No. 122 at 37–38.

Following FEMA's issuance of the grants, the campus further analyzed the environmental impacts of the HCFRR Project pursuant to the California Environmental Quality Act ("CEQA") in an Addendum to the 2020 LRDP EIR. The CEQA documentation and the HCFRR Project were approved by the campus on June 23, 2016. The approval prompted litigation from Hills Conservation Network ("HCN") alleging that the University had failed to adequately analyze the impacts of the HCRFF Project in the Addendum and that new CEQA documentation is required prior to commencing any work.

On September 6, 2016, FEMA advised that it was terminating the grant award to the campus to resolve the litigation challenging the EIS. FEMA adopted an Amended Record of Decision on September 20, 2016, stating that the two grants to UCB for the HCFRR Project were terminated. The litigation challenging the EIS was subsequently dismissed.

On October 27, 2016, the Alameda County Superior Court granted HCN's motion to enjoin the campus from implementing the HCFRR Project. The preliminary injunction will remain in place until the Court reaches a final decision on the merits of HCN's claims, which is currently scheduled for March 24, 2017. In light of the unavailability of necessary project funding, OGC and outside legal counsel recommend rescinding the June 23, 2016 Action approving the HCFRR Project rather than incurring the cost of defending the adequacy of the Addendum. The campus can then evaluate whether to prepare new CEQA documentation and consider approval of the HCRFF Project when funding is identified.

If the Action Item is rescinded, UCB can seek dismissal of the HCN CEQA lawsuit as moot. HCN will likely claim that it is entitled to attorneys' fees and costs on the basis that its lawsuit was the catalyst for the University's decision. This Item is not requesting authority to settle the claim.[150]

On February 2, 2017, the University's Chancellor approved the rescission of the June 2016 Action Item.[151]

### 4.2.4    Dismissing the *State HCN* lawsuit as moot

After the University rescinded the June 2016 Action Item, the University and HCN entered into a stipulation in the *State HCN* lawsuit that "UCB rescinded approval of the Project and Addendum, rendering potentially moot the claims asserted in the [*State HCN*] Petition" and that

---

[150] *Id.* at 37–38 (pp. 1–2).

[151] *Id.* at 38 (p. 2).

"[t]he parties are continuing discussions regarding the dismissal of this action, including resolution of potential claims for attorney fees and costs."[152]

On May 17, 2017, the state court awarded HCN attorney's fees in part, finding that "[HCN] w[as] a successful party in this action, and that [the *State HCN*] case resulted in enforcement of important public rights and conferred a significant benefit on the public. Therefore, the Court determines that [HCN is] entitled to an award of attorneys' fees pursuant to Code of Civil Procedure section 1021.5."[153]

### 5. The University's Revised Project

In November 2018, the University issued a Request for Qualifications for retention of an environmental-planning consultant for CEQA compliance for an updated plan for a "Revised Project" of fuels-management activities for its Hills Campus.[154]

Whereas the University's original Claremont Canyon and Strawberry Canyon applications called for the cutting down and eradication of approximately 22,000 non-native (e.g., eucalyptus) trees,[155] the University's Revised Project instead calls for "thinning and pruning hazardous trees, limbs and shrubs, and specifically removing hazardous trees and shrubs within 100 feet of roads, fire trails and structures, and paved and fire roads and all trees prone to torching within 200 feet of

---

[152] Stipulation to Vacate Scheduling Order and Set Status Conference, *Hills Conservation Network, Inc. v. Regents of the Univ. of Cal.*, No. RG16823477 (Cal. Super. Ct. Alameda Cty. Feb. 2, 2017) – ECF No. 123-3 at 133.

[153] Order, *Hills Conservation Network, Inc. v. Regents of the Univ. of Cal.*, No. RG16823477 (Cal. Super. Ct. Alameda Cty. May 17, 2017) – ECF No. 123-3 at 149.

[154] McGarrahan Decl. – ECF No. 121 at 7–8 (¶ 46); Univ. of Cal., *Request for Qualifications[:] University of California, Berkeley Hill Area Fire Fuel Management Plan Programmatic Environmental Impact Report Project Number 18265A* (Nov. 2018) ("Request for Qualifications") – ECF No. 122 at 43–58.

[155] *See* Claremont Canyon Application – AR 1.2.1-010 at 7–8, 20; Strawberry Canyon Application – AR 1.2.1-011 at 7–8, 20; Biological Opinion – AR 10.1-014 at 13, 15–16, 133 (pp. 5, 7–8, 125); Final EIS – AR 10.1-010 at 4, 9, 11 (pp. ES-4, ES-9, ES-11); Final EIS – AR 10.1-015 at 4, 47–49 (pp. 1-4, 3-33 to -35).

ridgelines."[156] Through its Revised Project, the University intends to implement fuel-mitigation activities in its entire 800-acre Hill Campus area, including the areas that had been covered by its original Claremont Canyon and Strawberry Canyon projects.[157]

Cal Fire awarded the University $3,621,000 in grant funding toward implementing hazardous-fuel-reduction projects in its Hills Campus.[158] The University's Statement of Work in its grant agreement with Cal Fire states that the University will "[r]educe crown fire potential by removing ladder fuels" and "[c]reate widely-spaced forests of tall trees, or in some locations, change the species composition to less-flammable hardwoods."[159] The University states that under its Revised Project, "[f]uel reduction, through thinning and understory removal, will minimize the chance a wildfire will consume tree canopy fuels."[160]

The University continues to pursue planning and environmental analysis for the Revised Project.[161] The University estimates that the review and approval process, including CEQA compliance, will take at least one additional year.[162]

On November 20, 2019, the University issued a Notice of Preparation of an Environmental Impact Report.[163] The Notice stated that the University would focus on removing all trees (regardless of species) near major evacuation routes, removing understory vegetation and select

---

[156] Univ. of Cal., *Request for Qualifications[:] University of California, Berkeley Hill Area Fire Fuel Management Plan Programmatic Environmental Impact Report Project Number 18265A* (Nov. 2018) ("Request for Qualifications") – ECF No. 122 at 51 (p. 9).

[157] McGarrahan Decl. – ECF No. 121 at 8 (¶ 48).

[158] *See* Request for Qualifications – ECF No. 122 at 49 (p. 7); Agreement Between Regents of the Univ. of Cal. and Cal. Dep't of Forestry and Fire Prot. (Mar. 11, 2019) – ECF No. 123-3 at 152–94 ("Cal Fire Grant Agreement").

[159] Cal Fire Grant Agreement – ECF No. 123-3 at 174 (Statement of Work p. 3).

[160] *Id.* at 175–76, 188 (Statement of Work pp. 4–5, 17).

[161] McGarrahan Decl. – ECF No. 121 at 8 (¶¶ 51–52).

[162] *Id.* (¶ 52).

[163] Regents of the Univ. of Cal., *Notice of Preparation of an Environmental Impact Report* (Nov. 20, 2019) – ECF No. 140 at 3–84.

trees in "fuel break areas," and removing "tall, unhealthy, structurally unsound or highly flammable trees" and "short understory trees" generally.[164]

The University is not pursuing CEQA compliance with respect to its original Claremont Canyon and Strawberry Canyon project.

## ANALYSIS

### 1. Governing Law

"The 'irreducible constitutional minimum' of standing consists of three elements." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (citing *Lujan*, 504 U.S. at 560–61; *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)). "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements." *Id.* (citing *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990)).

The related concept of mootness has been described (broadly speaking) as "'the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).'" *Friends of the Earth*, 528 U.S. at 189 (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n.22 (1997)). "'The doctrine of mootness, which is embedded in Article III's case or controversy requirement, requires that an actual, ongoing controversy exist at all stages of federal court proceedings.'" *Grand Canyon Trust v. U.S. Bureau of Reclamation*, 691 F.3d 1008, 1016 (9th Cir. 2012) (quoting *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1086 (9th Cir. 2011)). "'A claim is moot if it has lost its character as a present, live controversy.'" *Id.* (quoting *Am. Rivers v. Nat'l Marine Fisheries Serv.*, 126 F.3d 1118, 1123 (9th Cir. 1997)). "'If an event occurs that prevents

---

[164] *Id.* at 19–20 (pp. 2-5 to -6).

the court from granting effective relief, the claim is moot and must be dismissed.'" *Id.* at 1016–17 (quoting *Am. Rivers*, 126 F.3d at 1123).

"'[T]he burden of demonstrating mootness is a heavy one.'" *Feldman v. Bomar*, 518 F.3d 637, 642 (9th Cir. 2008) (quoting *Nw. Envtl. Def. Ctr. v. Gordon*, 849 F.2d 1241, 1244 (9th Cir. 1988)). "Nonetheless, 'a case or controversy exists . . . only when the challenged government activity is not contingent, has not evaporated or disappeared, and, by its continuing and brooding presence, casts what may well be a substantial adverse effect on the interests of the petitioning parties.'" *Id.* (quoting *Headwaters, Inc. v. Bureau of Land Mgmt.*, 893 F.2d 1012, 1015 (9th Cir. 1989)). "'The adverse effect must not be so remote and speculative that there is no tangible prejudice to the *existing interests* of the parties.'" *Id.* (emphasis in original) (quoting *Headwaters*, 893 F.2d at 1015). "'The basic question in determining mootness is whether there is a present controversy as to which effective relief can be granted.'" *Id.* (quoting *Gordon*, 849 F.2d at 1244).

A court is not limited to an administrative record in determining whether a case is moot because, "[b]y definition, mootness concerns events occurring *after* the alleged violation." *S. Utah Wilderness All. v. Smith*, 110 F.3d 724, 729 (10th Cir. 1997) (emphasis in original); *accord, e.g.*, *Idaho Rivers United v. U.S. Forest Serv.*, No. 1:11-CV-95-BLW, 2013 WL 474851, at *5 n.1 (D. Idaho Feb. 7, 2013) (holding that courts may use documents outside the administrative record to resolve mootness issues) (citing *S. Utah Wilderness*, 110 F.3d at 729).

## 2. Application

The University asks for (1) a declaratory judgment that FEMA's termination of its grants for the University's original Claremont Canyon and Strawberry Canyon project (and its issuance of the Amended Record of Decision documenting of that termination) was unlawful and (2) an injunction against FEMA to prevent it from terminating the grants unless and until it prepares a supplemental Environmental Impact Statement and complies with NEPA.[165] The University is no longer pursuing its original Claremont Canyon and Strawberry Canyon project, however, having

---

[165] Compl. – ECF No. 1 at 20 (Prayer for Relief ¶¶ 1–4).

affirmatively made the decision to rescind its own approval for its original project and instead to pursue its Revised Project. In light of the University's change of plans, a judgment in its favor regarding FEMA's termination of the grants for its original project would not provide it with effective relief.

An analogous situation in *Wittman v. Personhuballah*, 136 S. Ct. 1732 (2016), involved voters who alleged that Virginia's redrawing of their congressional districts was an unconstitutional racial gerrymander. *Id.* at 1734–75. The district court ruled in favor of the voters, finding that the redrawing was an unconstitutional racial gerrymander. *Id.* at 1735. Virginia did not appeal, but several individual congressional representatives intervened to appeal the district court's decision to the Supreme Court. *Id.* The representatives argued that the district court's ordered remedy — requiring Virginia to re-redraw its congressional districts — would harm their reelection prospects. *Id.* Relevantly here, one Republican representative said that his re-redrawn district (District 4) would be transformed "from a 48% Democratic district into a safe 60% Democratic district." *Id.* at 1736. After oral argument, however, the representative wrote a letter stating that he would seek election in another district (District 2) regardless of the decision on the appeal. *Id.* The Supreme Court held that the representative's decision not to pursue election in his original district and instead to pursue election in another district rendered his case moot. *Id.* at 1736–37 ("Given this letter, we do not see how any injury that [the representative] might have suffered 'is likely to be redressed by a favorable judicial decision.' Consequently, we need not decide whether, at the time he first intervened, [the representative] possessed standing. Regardless, he does not possess standing now.") (citations omitted). Similarly, the University is no longer pursuing its original Claremont Canyon and Strawberry Canyon project and instead is pursuing a Revised Project. Thus, a favorable judicial decision regarding its original project would not redress any alleged injury. *Cf. id.*; *accord, e.g.*, *Pub. Util. Comm'n v. Fed. Energy Regulatory Comm'n*, 100 F.3d 1451, 1457–59 (9th Cir. 1996) (finding challenge to agency's actions regarding gas company's expansion to be moot after company decided not to proceed with expansion) (citing cases); *see generally Feldman*, 518 F.3d at 642 (act being challenged must effect a "tangible prejudice to the *existing interests* of the parties") (emphasis in original).

The University raises several arguments in response, but they do not change the outcome.

The University argues that it has not abandoned its original project because "it is now pursuing fire risk mitigation work in the very same areas covered by the [original] Grants."[166] The FEMA grants were for a project to cut down eucalyptus and other non-native trees to remove the non-native overstory (with modifications for the "unified methodology" for 22.1 of the 99.1 total acres at issue). The Cal Fire project is different. The area may be the same, but the scope of work for the Cal Fire project involves removing understory and not removing the non-native overstory. FEMA's grants for the University's original project are not transferable to the University's Revised Project without FEMA's consent,[167] and thus a court order regarding the original grants would not provide the University with effective relief now that it is instead pursuing its Revised Project.

The University claims that the changes from its original project to its Revised Project are "minor."[168] This claim is belied by the University's prior assertions in the *HCN* lawsuits. In the *State HCN* lawsuit, for example, the University asserted that "FEMA also expressly rejected HCN's 'selective thinning' methodology as ineffective and infeasible," that "[t]he EIS explained why a methodology which leaves tall eucalyptus and Monterey pine trees is ineffective at reducing fire risk," and that "FEMA concluded that . . . [']a program of only removing brush, debris and small trees does not adequately address the special characteristics of eucalyptus and Monterey pine trees that can make wildfires difficult or even impossible to control [and that] reliance on continuous removal of ladder fuels under tall trees on steep slopes would likely be prohibitively

---

[166] Univ. Reply and Cross-Opp'n – ECF No. 130 at 14.

[167] Claremont Canyon Acceptance Letter – AR 1.2.1-016 at 2 ("Any change to the approved statement of work (SOW) requires prior approval from FEMA."); Strawberry Canyon Acceptance Letter – AR 1.2.1-017 at 2 (same); *accord* 2 C.F.R. § 200.308(c)(1) ("For non-construction Federal awards, recipients must request prior approvals from Federal awarding agencies for one or more of the following program or budget-related reasons: (i) Change in the scope or the objective of the project or program (even if there is no associated budget revision requiring prior written approval.").

[168] Univ. Reply and Cross-Opp'n – ECF No. 130 at 15.

expensive and increase erosion by disturbing soils.[']"[169] The University is now pursuing a Revised Project to "remov[e] ladder fuels," "[c]reate widely-spaced forests of tall trees," and focus on "[f]uel reduction, through thinning and understory removal"[170] — the approach that it argued FEMA rejected. The University cannot claim that this new approach contains only "minor revisions," and it cannot rely on FEMA's earlier grants or final Environmental Impact Statement now that it is pursuing a Revised Project. *Cf. Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 560–61 (9th Cir. 2006) (noting that agencies must prepare a supplemental Environmental Impact Statement when there are substantial changes to the proposed action that are relevant to environmental concerns, citing 40 C.F.R. § 1502.9(c)(1), and holding that an agency cannot argue that its changes were supported by an earlier Environmental Impact Statement where the earlier Statement rejected those changes).

The University argues that it decided to rescind its approval for its original project "in substantial part" because of FEMA's termination of its grants.[171] The University's argument that FEMA's termination of its grants prevented it from pursuing its original project is at odds with the position it took in opposing HCN's motion for a preliminary injunction in the *State HCN* lawsuit, where — despite FEMA's having terminated its grants — it implied that it was still moving

---

[169] Opposition of the Regents of the University of California to Hills Conservation Network's Application for Preliminary Injunction and Stay, *Hills Conservation Network, Inc. v. Regents of the Univ. of Cal.*, No. RG16823477 (Cal. Super. Ct. Alameda Cty. Oct 14, 2016) – ECF No. 123-3 at 50, 65–66 (citing and quoting Final EIS – AR 10.1-015 at 16–18 (pp. 3-2 to -4)); *accord* Regents of the University of California's Notice of Cross-Motion, Cross-Motion for Summary Judgment and Opposition to Plaintiff Hills Conservation Network's Motion for Summary Judgment, *Hills Conservation Network v. FEMA*, No. 3:15-cv-01057-LB (N.D. Cal. Apr. 18, 2016), ECF No. 80 at 6 ("[T]he administrative record demonstrates that the selective thinning methodology would be infeasible and ineffective in heavily sloped and inaccessible acreage, including much of the University's property within the Project area. As such, FEMA approved the use of selective thinning in areas where the University could feasibly accomplish the required long-term maintenance. FEMA also determined that the overstory removal methodology would successfully reduce fire risk and accomplish the Project's purpose and need.").

[170] Cal Fire Grant Agreement – ECF No. 123-3 at 174–76, 188 (Statement of Work pp. 3–5, 17).

[171] Univ. Reply and Cross-Opp'n – ECF No. 130 at 12. The University does not mention that another reason for its deciding to rescind its approval was because the *State HCN* had enjoined it from pursuing its original project and it wanted to avoid having to continue defending the *State HCN* lawsuit. Rescission – ECF No. 122 at 37–38 (pp. 1–2).

forward with its original project and argued that HCN's injunction, not FEMA's termination, would be the cause of any delay.[172]

The University argues that it was entitled to "rely[] on the Incidental Take Permit to allow the University to conduct fire risk mitigation in all areas of Claremont and Strawberry Canyons," that FEMA's terminating its grants deprived it of a federal nexus for its incidental-take permit, and that the court could redress its injuries by reversing FEMA's decision and thereby restoring the federal nexus for its incidental-take permit.[173] What this argument ignores is that the prior incidental-take permit did not give the University a broad license to engage in incidental take of listed species in connection with any and all fire-risk-mitigation activities it might pursue. The Fish and Wildlife Service issued the incidental-take permit as part of a Biological Opinion that reviewed the University's original project, where non-native trees would be cut down and eradicated, thereby (among other things) creating new habitat for the Alameda whipsnake.[174] The Opinion expressly stated that the changes to the University's (or another subapplicant's) project would require reinitiation of formal consultation by the Fish and Wildlife Service (although only with respect to that subapplicant's portion).[175] The Opinion did not review a Revised Project focusing on understory removal (which the University itself argued could disrupt whipsnake habitat).[176] The

---

[172] Opposition of the Regents of the University of California to Hills Conservation Network's Application for Preliminary Injunction and Stay, *Hills Conservation Network, Inc. v. Regents of the Univ. of Cal.*, No. RG16823477 (Cal. Super. Ct. Alameda Cty. Oct 14, 2016) – ECF No. 123-3 at 51, 68.

[173] Univ. Reply and Cross-Opp'n – ECF No. 130 at 14.

[174] Biological Opinion – AR 10.1-014 at 13, 15 (pp. 5, 7).

[175] *Id.* at 125, 137, 144–145 (pp. 125, 129, 136–137); *accord* 50 C.F.R. § 402.16(a) ("Reinitiation of consultation is required and shall be requested by the Federal agency or by the Service, where discretionary Federal involvement or control over the action has been retained or is authorized by law and: . . . (3) If the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion or written concurrence[.]").

[176] Regents of the University of California's Notice of Cross-Motion, Cross-Motion for Summary Judgment and Opposition to Plaintiff Hills Conservation Network's Motion for Summary Judgment, *Hills Conservation Network v. FEMA*, No. 3:15-cv-01057-LB (N.D. Cal. Apr. 18, 2016), ECF No. 80 at 9–10 ("UC's land is not configured or improved to facilitate labor-intensive ground fuel removal, and any such efforts would be expensive, dangerous to workers and disruptive to faunal habitats, particularly those of the Alameda Whipsnake.").

incidental-take permit for the University's original project of overstory removal is not transferable to the University's Revised Project of understory removal, and thus a court order regarding the original grants would not provide the University with effective relief in the form of an incidental-take permit that it can use now that it is pursuing its Revised Project.[177] *Cf. Ctr. for Biological Diversity*, 698 F.3d at 1108 (noting that agencies must reinitiate consultation with the Fish and Wildlife Service if a proposed action "is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion" and that reinitiation of consultation invalidates prior biological opinions and incidental-take statements).

The University, and all parties, are rightly interested in mitigating the risk of dangerous and potentially deadly wildfires. And it may appear unfair that the University's decision to mitigate fire risk by proceeding with a Revised Project (instead of doing nothing) inures to its detriment by mooting its lawsuit. On the other hand, the University decided to proceed with its Revised Project and not its original project. The University did not file suit to challenge FEMA's termination of its grants when it learned that FEMA would do so in the summer of 2016. The University did not litigate the *State HCN* lawsuit to completion to try to vacate the injunction against its original project. The University did not pursue an Environmental Impact Report for CEQA compliance for its original project. The University waited nearly a year after FEMA terminated its grants and after the *State HCN* court enjoined its original project, and nearly six months after it rescinded its approval for the project, before it filed this lawsuit. And since it filed this lawsuit, Cal Fire granted it $3.6 million for its Revised Project.

---

[177] The University states that its Revised Project excludes fuel-mitigation work in species habitat areas because of a lack of an incidental-take statement to argue that the restoration of the incidental-take statement would redress its injuries. Univ. Reply and Cross-Opp'n – ECF No. 130 at 14–15 (citing McGarrahan Decl. – ECF No. 121 at 8 (¶ 49)). But the Biological Opinion states that the University's initial treatment activities would have been limited to areas outside of Alameda whipsnake habitat areas under its original project as well. Biological Opinion – AR 10.1-014 at 122 (p. 114). The Biological Opinion discusses how the University's original project of cutting down eucalyptus trees will result in the creation of new habitat for the whipsnake and that this new-habitat creation supported allowing incidental take of the whipsnake as part of the project. *Id.* at 122, 136 (pp. 114, 128). The University's Revised Project changes this calculus. *See id.* at 124 (p. 116) (if 50% or more of the eucalyptus canopy is retained, "the [Fish and Wildlife] Service does not believe that any suitable Alameda whipsnake habitat will be created").

The University is pursuing the Revised Project. The University's lawsuit regarding its original project is moot.

## CONCLUSION

The court grants the defendants' motions to dismiss the case as moot.

**IT IS SO ORDERED.**

Dated: December 20, 2019



_____
LAUREL BEELER
United States Magistrate Judge